# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ACE AMERICAN INSURANCE COMPANY**<br>**9200 Northpark Drive**<br>**Suite 300**<br>**Johnston, Iowa 50131;** | ) ) ) ) ) | **Case No.** _____ |
| **AMERICAN AGRI-BUSINESS INSURANCE**<br>**COMPANY**<br>**7101 82nd Street**<br>**Lubbock, Texas 79424;** | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| **AMERICAN AGRICULTURAL INSURANCE**<br>**COMPANY**<br>**1501 East Woodfield Road**<br>**Suite 300W**<br>**Schaumburg, Illinois 60173;** | ) ) ) ) ) ) | **COMPLAINT** |
| **GUIDEONE MUTUAL INSURANCE**<br>**COMPANY**<br>**c/o CGB Insurance Company**<br>**1608A West Lafayette Avenue**<br>**Jacksonville, IL 65650;** | ) ) ) ) ) ) | |
| **COUNTRY MUTUAL INSURANCE**<br>**COMPANY**<br>**1701 North Towanda Avenue**<br>**Bloomington, Illinois 61702;** | ) ) ) ) ) | |
| **EVEREST REINSURANCE COMPANY**<br>**120 SE 6th Street**<br>**Building 2 Suite 210**<br>**Topeka, Kansas 66603;** | ) ) ) ) ) | |
| **FARMERS MUTUAL HAIL INSURANCE**<br>**COMPANY OF IOWA**<br>**6785 Westown Parkway**<br>**West Des Moines, Iowa 50266;** | ) ) ) ) ) | |
| **GREAT AMERICAN INSURANCE**<br>**COMPANY**<br>**301 East Fourth Street, GAT-26S**<br>**Cincinnati, Ohio 45202;** | ) ) ) ) ) | |

**HUDSON INSURANCE COMPANY**                    )
**7300 W. 110ᵗʰ Street, Suite 400**              )
**Overland Park, KS 66210;**                     )
                                                 )
**NAU COUNTRY INSURANCE COMPANY**                )
**7333 Sunwood Drive**                           )
**Ramsey, Minnesota 55303;**                     )
                                                 )
**OCCIDENTAL FIRE AND CASUALTY**                 )
**COMPANY OF NORTH CAROLINA**                    )
**4551 West 107ᵗʰ Street, Suite 250**            )
**Overland Park, Kansas 66207;**                 )
                                                 )
**PRODUCERS AGRICULTURE INSURANCE**              )
**COMPANY**                                      )
**2025 South Hughes Street**                     )
**Amarillo, Texas 79105; and**                   )
                                                 )
**RURAL COMMUNITY INSURANCE**                    )
**COMPANY**                                      )
**3501 Thurston Avenue**                         )
**Anoka, Minnesota 55303-1060**                  )
                                                 )
                       **PLAINTIFFS,**           )
                                                 )
**v.**                                           )
                                                 )
**FEDERAL CROP INSURANCE**                       )
**CORPORATION, a corporation within the**        )
**United States Department of Agriculture**      )
**c/o Office of the General Counsel**            )
**United States Department of Agriculture**      )
**Room 107W, Whitten Building**                  )
**1400 Independence Avenue, SW**                 )
**Washington, DC 20250-1400**                    )
                                                 )
**Also serve:**                                  )
  **United States Attorney General**   )
  **United States Department of Justice** )
  **950 Pennsylvania Avenue, NW**       )
  **Washington, DC 20530**             )
                                                 )
  **United States Attorney**           )
  **Judiciary Center Building**         )
  **555 Fourth Street, NW**            )
  **Washington, DC 20530**             )

| | |
|---|---|
| **and** | ) |
| | ) |
| **RISK MANAGEMENT AGENCY, an agency** | ) |
| **within the United States Department of** | ) |
| **Agriculture** | ) |
| **c/o Office of the General Counsel** | ) |
| **United States Department of Agriculture** | ) |
| **Room 107W, Whitten Building** | ) |
| **1400 Independence Avenue, SW** | ) |
| **Washington, DC 20250-1400** | ) |
| | ) |
| **Also serve:** | ) |
| **United States Attorney General** | ) |
| **United States Department of Justice** | ) |
| **950 Pennsylvania Avenue, NW** | ) |
| **Washington, DC 20530** | ) |
| | ) |
| **United States Attorney** | ) |
| **Judiciary Center Building** | ) |
| **555 Fourth Street, NW** | ) |
| **Washington, DC 20530** | ) |
| | ) |
| **DEFENDANTS.** | ) |

Plaintiffs ACE American Insurance Company, American Agri-Business Insurance Company, American Agricultural Insurance Company, GuideOne Mutual Insurance Company, Country Mutual Insurance Company, Everest Reinsurance Company, Farmers Mutual Hail Insurance Company of Iowa, Great American Insurance Company, Hudson Insurance Company, NAU Country Insurance Company, Occidental Fire and Casualty Company of North Carolina, Producers Agriculture Insurance Company, and Rural Community Insurance Company (collectively, "approved insurance providers" or "AIPs"), for their Complaint against the Federal Crop Insurance Corporation ("FCIC") and Risk Management Agency ("RMA"), state:

3

**Nature of the Action**

1.      The AIPs sell and service crop insurance under the federal crop insurance program.  They insure agricultural producers across the nation, through more than one million insurance policies reinsured by FCIC, against various potential losses associated with their respective crops.

2.      FCIC's false promises and material misrepresentations relied upon by the AIPs relating to the 2011 Standard Reinsurance Agreement ("SRA") between FCIC and each AIP are the subject of this Complaint.  This SRA (excluding Appendices I-IV) is identical for each AIP, and a sample is attached as Exhibit A and incorporated by reference in this Complaint.  As explained more fully below, the financial terms and conditions of this SRA were negotiated in 2009-10 and are effective from July 1, 2010 through at least June 30, 2015.

3.      At issue herein are alleged false promises and material misrepresentations preceding the adoption of a materially changed methodology used to calculate premium rates for various crops insured under the Federal crop insurance program.  The adoption of the changed methodology was directly contrary to express representations made by FCIC to the AIPs during the SRA negotiations and resulted in AIPs failing to receive the benefits reasonably expected as part of their agreement with FCIC.  The AIPs have calculated damages in excess of $200 million per year.

4.      In addition, FCIC violated 7 U.S.C. § 1508(k)(8) when it changed the financial terms and conditions of the 2011 SRA during the five year applicable period, and 7 U.S.C. 1508(k)(3) when it failed to consider the financial condition of the AIPs and the effect that such changes in the financial terms and conditions of the 2011 SRA would have on the AIPs.

4

5.      Prior to initiation of this action, Plaintiffs submitted certain claims to FCIC and RMA pursuant to the administrative exhaustion requirement of 7 U.S.C. § 6912(e) and 7 C.F.R. § 402.169(a).  Once Plaintiffs' claims were denied, or not acted upon by FCIC, the Plaintiffs instituted an appeal before the Civilian Board of Contract Appeals ("CBCA").

6.      On November 3, 2014, the CBCA denied Plaintiffs' appeal in a final ruling ("CBCA Order").  A true and correct copy of the CBCA Order is attached hereto as Exhibit B.

7.      Plaintiffs bring an original action seeking relief relating to claims that are outside the scope of CBCA jurisdiction as well as those appealed to CBCA.  In the alternative, Plaintiffs bring an original action seeking relief relating to claims that are outside the scope of CBCA jurisdiction and seek a declaration that the CBCA Order is in error.  All claims are premised on the same operative facts.

**The Parties**

8.      Plaintiff ACE American Insurance Company ("ACE") executed the 2011 and each succeeding, substantially identical SRA.  At all times material to this Complaint, Rain and Hail L.L.C. acted as ACE's managing general agent with respect to the 2011 and subsequent SRAs and matters arising thereunder.

9.      Plaintiff American Agri-Business Insurance Company ("American Agri-Business") executed the 2011 and each succeeding, substantially identical SRA.  At all times material to this Complaint, ARMtech Insurance Services, Inc. acted as American Agri-Business's managing general agent with respect to the 2011 and subsequent SRAs and matters arising thereunder.

10.     Plaintiff American Agricultural Insurance Company ("American Agricultural") executed the 2011 and each succeeding, substantially identical SRA.  At all times material to this

5

Complaint, American Farm Bureau Insurance Services, Inc. acted as American Agricultural's managing general agent with respect to the 2011 and subsequent SRAs and matters arising thereunder.

11.  Austin Mutual Insurance Company ("Austin Mutual") executed the 2011 and 2012 SRAs.  Plaintiff GuideOne Mutual Insurance Company ("GuideOne") executed the 2013 and succeeding SRAs and entered into an agreement with Austin Mutual wherein it assumed Austin Mutual's rights and obligations under the 2011 and 2012 SRAs.  At all times material to this Complaint, CGB Diversified Services acted as Austin Mutual's managing general agent with respect to the 2011 and 2012 SRAs and as GuideOne's managing general agent with respect to the 2013 and subsequent SRAs and matters arising thereunder.

12.  Plaintiff Country Mutual Insurance Company ("Country Mutual") executed the 2011 and each succeeding, substantially identical SRA.

13.  Plaintiff Everest Reinsurance Company ("Everest") executed the 2011 and each succeeding, substantially identical SRA.  At all times material to this Complaint, Heartland Crop Insurance Inc. acted as Everest's managing general agent with respect to the 2011 and subsequent SRAs and matters arising thereunder.

14.  Plaintiff Farmers Mutual Hail Insurance Company ("Farmers Mutual") executed the 2011 and each succeeding, substantially identical SRA.

15.  Plaintiff Great American Insurance Company ("Great American") executed the 2011 and each succeeding, substantially identical SRA.

16.  Plaintiff Hudson Insurance Company ("Hudson") executed the 2011 and subsequent SRAs.

6

17.     Plaintiff NAU Country Insurance Company ("NAU") executed the 2011 and each succeeding, substantially identical SRA.

18.     Plaintiff Occidental Fire and Casualty Company of North Carolina ("Occidental") executed the 2011 and each succeeding, substantially identical SRA.

19.     Plaintiff Producers Agriculture Insurance Company ("Producers") executed the 2011 and each succeeding, substantially identical SRA.  At all times material to this Complaint, Pro Ag Management Inc. acted as Producer's managing general agent with respect to the 2011 and each succeeding, substantially identical SRA and matters arising thereunder.

20.     Plaintiff Rural Community Insurance Company ("Rural Community") executed the 2011 and each succeeding, substantially identical SRA.  At all times material to this Complaint, Rural Community Insurance Services acted as Rural Community's managing general agent with respect to the 2011 and each succeeding, substantially identical SRA and matters arising thereunder.

21.     Plaintiffs ACE, American Agri-Business, American Agricultural, Austin Mutual, Country Mutual, Everest, Farmers Mutual, Great American, Hudson, NAU, Occidental, Producers, and Rural Community have been injured in their business and property, and therefore sustained damages, as a result of the acts about which they complain herein.

22.     FCIC is a body corporate with its principal office in the District of Columbia.  7 U.S.C. § 1503.

23.     The Risk Management Agency ("RMA") is an agency within the USDA and administers and oversees all programs authorized by FCIC.

24.     FCIC was created pursuant to 7 U.S.C. § 1503 as an agency and corporation of and within the United States Department of Agriculture ("USDA") to carry out the purposes of the Federal Crop Insurance Act, U.S.C. § 1501 et seq.  ("FCIA").

25.     FCIC is authorized to enter into and carry out contracts and agreements, binding the government of the United States.  7 U.S.C. § 1506(l).

## Jurisdiction and Venue

26.     This case arises under the laws of the United States and the Court has jurisdiction pursuant to 7 U.S.C. § 1506(d) and 28 U.S.C. § 1331.

27.     Plaintiffs have exhausted all applicable administrative remedies that are a pre-requisite to suit under 7 U.S.C. § 6912(e) having obtained final agency determinations from FCIC and having pursued appeals thereof through the CBCA.

28.     Venue is proper in this Court pursuant to 7 U.S.C. § 1506(d) which provides that "The district courts of the United States, including the district courts of the District of Columbia and of any territory or possession, shall have exclusive original jurisdiction, without regard to the amount in controversy, of all suits brought by or against the Corporation.  . . . Any suit against the Corporation shall be brought in the District of Columbia, or in the district wherein the plaintiff resides or is engaged in business."

## Background Facts

## The Federal Crop Insurance Program

29.     In 1938, the United States Congress passed the FCIA "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and

8

establishing such insurance." *Id.* at § 1502(a).  Subsequent amendments to the FCIA have made

Federal crop insurance the paramount risk management device for America's agricultural

producers.

30.     FCIC does not sell crop insurance directly to agricultural producers.  Rather,

private insurance companies are authorized by FCIC to sell and service crop insurance policies

under terms and conditions prescribed by FCIC.

31.     Only insurance companies approved by FCIC may offer Federal crop insurance.

32.     Those insurance companies are required to offer crop insurance at premium rates

and on other terms and conditions established by FCIC.  7 U.S.C. §§ 1508(d) & 1508(k).

33.     FCIC is required by the FCIA to set adequate premium rates that are determined

to be actuarially sound, and they must be sufficient to attain an expected loss ratio no greater

than 1.0.  7 U.S.C. § 1508(d).

34.     FCIC adjusts premium rates for various crops and locations periodically.  As

explained in more detail below, the methodology historically employed by FCIC in making these

premium adjustments has been understood by approved insurance providers, thus permitting

them to estimate with a reasonable degree of confidence the changes to premium rates that may

occur over a cycle of 3-5 years.  The predictability of premium rates is important to AIPs

because it allows them to plan their business activities to ensure that the Federal crop insurance

program is administered in an appropriate and efficient manner.

35.     When quoting premiums for coverage, approved insurance providers must quote

the rates determined by FCIC.  7 U.S.C. § 1508(d).  Approved insurance providers also must

make available, in all states where they do business, all crop insurance plans approved by the

Secretary of USDA for all crops designated by the Secretary for coverage in those states (or

9

counties or other portions thereof), and such providers must make such coverages available on a non-discriminatory basis.  7 C.F.R. §§ 400.168(b), 400.168(f).  Therefore, AIPs must accept the underwriting risks mandated by FCIC at premium rates set by FCIC.

### The Standard Reinsurance Agreement

36.     Each Plaintiff is an approved insurance provider as defined by the FCIA, 7 U.S.C. § 1502(b)(2), and each writes Federal crop insurance coverages approved by FCIC.

37.     FCIC reinsures a defined portion of the underwriting risk of AIPs. Pursuant to regulations it promulgated in 1987, FCIC enters into a binding contract generically described as the "Standard Reinsurance Agreement" or "SRA," with eligible insurance companies to reinsure the policies issued by those companies to producers of agricultural commodities.  7 C.F.R. § 400.164.

38.     Each AIP entered into a reinsurance agreement with FCIC in the form of the 2011 SRA effective as of July 1, 2010.  Thereafter, each AIP executed SRAs effective as of July 1, 2011 (for the 2012 reinsurance year), July 1, 2012 (for the 2013 reinsurance year), July 1, 2013 (for the 2014 reinsurance year) and July 1, 2014 (for the 2015 reinsurance year) with the exception of Austin Mutual, which, as noted above, transferred its interest in the SRA to GuideOne Insurance Company as of July 1, 2012.  Despite the differences in reinsurance years, each SRA effective since July 1, 2010 has contained the identical financial terms and conditions negotiated in 2009-10.

39.     The SRA governs the contractual relationship between FCIC and AIPs and also contains provisions relating to the compensation that can be achieved by AIPs for their roles in selling and servicing crop insurance policies to the nation's agricultural producers.

40.     As part of the 2008 Farm Bill, Congress required that the financial terms and conditions of the reinsurance agreements between the AIPs and FCIC remain the same for five years.  7 U.S.C. § 1508(k)(8).  (The concept of a five year SRA first was embodied in legislation in Section 148 of the Agricultural Risk Protection Act of 2000, Public Law 106-224; negotiation of the SRA in 2009-10 proceeded on the basis of § 1508(k)(8) as amended by the 2008 Farm Bill.)  The 2011 SRA that became effective on July 1, 2010 was negotiated between FCIC and the AIPs over a period of approximately one year before its effective date, i.e., from August 2009 through June 2010. The agreement's financial terms are not subject to change any earlier than the 2016 SRA.

41.     Congress required the SRA financial terms and conditions to remain static for a five year period because of the need for stability in the Federal crop insurance program.  Indeed, prior to the adoption of the Agricultural Research, Extension, and Education Reform Act of 1998, Public Law 105-185, AIPs were at risk of annual renegotiation of the SRA's financial terms.  Until negotiation of the 1998 SRA in 1996-97, FCIC historically had used periodic (and often annual) SRA negotiations with approved insurance providers as a mechanism to make a series of program changes.  As detailed herein, the asymmetric availability of information as between FCIC and the AIPs during an SRA negotiation mandates the reliance by AIPs on statements and assurances made by FCIC.

42.     Notwithstanding the requirement that the financial terms and conditions of an SRA remain constant for five years, FCIC insists that an SRA is a one year contract, and it now requires each approved insurance provider to execute a new, substantially identical, SRA each year.

11

43.     The 2011 SRA contains two key provisions that govern the compensation achievable by the AIPs under the SRA. First, AIPs and FCIC negotiate various formulas for sharing underwriting gains and risk of loss. These provisions are generally referred to as the underwriting gain and loss provisions and are contained in Section II of the 2011 SRA. Second, under Section III of the SRA, AIPs are paid an administrative and operating expense ("A&O") reimbursement that defrays in part their costs incurred in selling and servicing Federal crop insurance policies.

44.     A&O expense reimbursements are calculated as a defined percentage of the premium calculated for a particular crop insurance policy. Therefore, any reduction in premium can result in lower A&O expense reimbursement.

45.     Over the years, Congress has placed caps on amounts that can be paid to AIPs as A&O expenses, and since 1997 FCIC has negotiated A&O reimbursements at levels less than those authorized by the FCIA.  In general, A&O expense payments do not fully compensate AIPs for the costs incurred by them in selling and servicing Federal crop insurance policies.

46.     Beginning in 1997, FCIC indicated its desire that approved insurance providers assume a larger share of the risk of loss in the Federal crop insurance program.  This was seen by FCIC as another mechanism to reduce taxpayer funded costs of paying indemnities to agricultural producers who suffered covered losses.

47.     With the reduction in A&O payments and the approved insurance providers assuming a greater share of the risk of loss in the Federal crop insurance program, the provisions relating to assumption of risk and the sharing of underwriting gains became the critical financial factor in SRA negotiations because those provisions bear directly on the ultimate compensation that each approved insurance provider can earn.

12

48.     The underwriting gain and loss provisions of the SRA allow each approved insurance provider to select the level of risk it wishes to retain on its books and the amount of risk it wishes to cede to FCIC.  After crop insurance policies are sold, they are assigned to a specific fund under Section II of the SRA, subject to limitations and mandatory assignment contained in Section II.  In general, the greater the amount of risk retained by the approved insurance provider, the greater the percentage of premium the approved insurance provider retains to compensate it for assuming that risk.  Conversely, the higher the percentage of risk shifted to FCIC, the higher the percentage of premium that is ceded to FCIC.

49.     As part of the SRA process, from year to year, each approved insurance provider is required to submit a plan of operations ("Plan") by April 1 preceding the next reinsurance year, which starts July 1 of the same calendar year.

50.     Part of the Plan details the AIP's financial plans for the coming year, including the aggregate and state-by-state amounts of premium expected to be written and levels of risk expected to be retained by the AIP in the available reinsurance funds.  The Plan also demonstrates the approved insurance provider's financial ability to assume the risks it proposes to assume.

51.     In order to determine the level of risk associated with various crop insurance policies, AIPs must know, or have a reasonably reliable basis to estimate, the premium to be charged agricultural producers for insurance of various commodities, as well as the mechanism that will be employed by FCIC to set and adjust premium rates going forward.

52.     Accordingly, the premium rates to be set by FCIC are of utmost importance to AIPs and a material element in an approved insurance provider's analysis of risk exposure, its

ability to achieve an underwriting gain, the effect on AIPs' A&O reimbursement, and the overall economic analysis of entering into the SRA.

53.     While AIPs understand that premium rates can be adjusted periodically by FCIC under provisions of the FCIA, the mechanism for making those adjustments historically has been well understood by them and can be factored into the financial models and assumptions used when negotiating the SRA, in committing to participate as an approved insurance provider under the Federal crop insurance program, and in making the substantial financial commitments that go hand-in-hand with such participation.

54.     The potential for significant rate changes can affect AIPs' A&O reimbursement and their ability to achieve an underwriting gain and thus affect both their profitability and their ability to sell and service Federal crop insurance policies.

55.     In addition, premium rates can impact the level of coverage purchased by producers. For example, if premiums decline significantly, producers may elect to increase coverage and pay essentially the same premium as in prior years. That choice may subject approved insurance providers to greater risk of loss, and potentially higher loss adjustment costs, in exchange for the same premium they previously received.

56.     For more than thirty years, premium rate changes have been implemented by FCIC using what is termed the "loss cost" approach.  Under this approach, each year's historical loss data is essentially averaged with prior year losses to determine an expected level of loss for the following year.

57.     AIPs fully understand this process for setting premium rates, as it has been the methodology employed by FCIC consistently for the past several decades. Each additional year of historical data can affect rates to some degree, but the change is incremental because the

14

additional year is averaged with prior decades of historical data. Those incremental changes can be analyzed and effectively anticipated by AIPs.

58.    Indeed, the movement of premium rates is fairly predictable under the historically used loss cost approach.  Because losses and claims are being experienced by producers and insurers before the loss data is used to set premium rates for the next year, AIPs can easily and accurately anticipate rate movements and reliably plan their business activities, including their decision making with respect to risk retention.

**SRA Negotiations in 2009-2010**

59.    As noted above, the underwriting gain and loss provisions of the SRA are the central financial aspect of the agreement.

60.    Because premium rates are the underpinning of all the financial terms and conditions in Section II of the SRA, during the negotiation of the 2011 SRA the AIPs were keenly concerned that the methodology used to set premium rates during the five-year term of the 2011 SRA remain reasonably static.

61.    The AIPs unease regarding potential methodology changes was articulated during the negotiation of the 2011 SRA. Specifically, on October 19, 2009, National Crop Insurance Services ("NCIS") on behalf of the Plaintiffs sent a document entitled "Recommendations For The Standard Reinsurance Agreement" to FCIC regarding the 2011 SRA.  In it, NCIS stated:

> Issue: AIPs make their fund assignment decisions based on the expected profitability and risk of the insured policies.   However, the underlying profitability of the business can be affected by FCIC/RMA decisions that materially change the rate being changed.  **The industry is concerned that the contracted study of rating methodology may have a material effect on future rates and profitability of the program.** Due to the timing of the release of the Study, these changes are outside the scope of the current SRA negotiations. **Wholesale revisions to rates or rating methodology may impact an AIP's ability to make optimal fund assignment decisions, adequately manage its risk, or achieve a competitive rate of return.**

DB04/0763432.0033/11514136.2

Recommendation:  The industry's ability to re-negotiate the SRA is based on the presumption that the profitability of the program will be unaffected by subsequent actions taken by FCIC/RMA.  Negotiations would be rendered irrelevant if the private sector's opportunity to earn a profit could be altered at the government's discretion following the signing of the SRA. **In particular, if the contracted rate study leads to a major realignment of rates or the introduction of a revised rating methodology, it has the potential of adversely affecting the future profitability of the program.  This concern should be addressed by including a stipulation in the SRA that allows for modification of the reinsurance provisions to maintain the level of underwriting income expected at the time the SRA is signed.** Modifications would be triggered by significant rate changes, revisions to the current rating structure, or the implementation of a revised ratemaking methodology….

(Emphasis added)

62.     This concern was particularly acute in 2009-2010 during which the 2011 SRA was being negotiated, because FCIC had commissioned a study of its rate setting methodology. The draft results of that study ("Study 1") were communicated to FCIC in November 2009, and a draft report was made available for public comment through January 19, 2010. Because of the essential role of premium rates in determining an AIP's ability to achieve an underwriting gain and the level of A&O that AIPs could expect to earn, AIPs were intensely interested in knowing whether major rate changes were recommended by Study 1. That was so because to the extent FCIC was contemplating changing rate methodology during the five-year period covered by the 2011 SRA, AIPs intended to seek adjustments to the gain and loss provisions to reflect premium rates calculated under that new methodology. Otherwise, AIPs would be agreeing to a contract with indefinite or illusory financial terms.

63.     One of the basic conclusions of Study 1 was that FCIC's methodology, the "loss cost" methodology, was fundamentally correct. Given that finding, the AIPs reasonably believed that no major rate changes were being considered by FCIC. In particular, they justifiably believed there would be no material change in the FCIC rate setting methodology and that AIPs

16

could expect relatively predictable rates going forward and for the five-year period of the SRA's financial terms and conditions.

64.     But AIPs did not rely solely on the conclusions regarding methodology in Study 1. Thus, as the 2011 SRA negotiations were ongoing with FCIC, AIPs specifically asked FCIC negotiators and officials whether any changes to the rate setting methodology were contemplated. In response to those specific questions, FCIC told AIPs on several occasions in the spring of 2010 that the methodology study (Study 1) had been finalized and reviewed and that it appeared that the rates for the "major commodities [were] about right." Such statements not only confirmed AIPs' understanding of Study 1, but also constituted specific assurance that there would be no major change in rating methodology impacting the financial terms and conditions negotiated for the 2011-15 reinsurance years.

65.     In reliance on these representations, AIPs agreed to the underwriting gain and loss provisions of the 2011 SRA, which became effective July 1, 2010, and which were to remain effective through the 2015 reinsurance year in accordance with 7 U.S.C. § 1508(k)(8).

66.     During the period from late 2009 to the July 1, 2010 effective date of the 2011 SRA, in addition to the specific statements made to AIPs, various participants in the federal crop insurance program also made public inquiry of FCIC/RMA asking if it planned any changes to its rate-setting methodology. In response, RMA consistently stated that no changes were planned.  For example:

     a.     On January 11, 2010, Craig Witt, RMA's official in charge of the coordination of the RMA SRA negotiating team, met with 25 commodity groups where one question asked was "the potential for our premium rating methodology study [Study 1] to significantly change company [AIP] profitability after an SRA was finalized?  (We answered there was little chance for that to happen).

b.   On January 29, 2010, Craig Witt forwarded a draft letter he had written to various farm organizations.  In it, Mr. Witt stated:

> With respect to rating methodology, RMA had posted a recent study on its website which investigated this issue in detail.  The study's findings indicate that RMA's current rating methodology is generally sound and the study's authors do not recommend any sweeping changes that would materially affect underwriting gains and losses or A&O subsidies in the program.
>
> * * * * *
>
> Any claim you may have heard that RMA would recklessly implement sweeping changes in premium rates after SRA negotiations are concluded and thereby jeopardize the program and its delivery cost structure is unsupported and irresponsible."

c.   From February 2010 through April 2010, RMA periodically posted a document titled "Myth vs. Fact" on its website.  In its response to the myth "Lower reimbursement rates will be passed along to producers in the form of higher premiums."  RMA stated … "RMA recently contracted for an independent review of its premium rating methodology, which confirmed that it is actuarially appropriate and consistent with industry standards."

d.   On June 24, 2010, William Murphy, RMA Administrator at the time, sent a letter to United States Senator Tom Harkin in which he stated:

> You ask that RMA consider a long-term horizon for evaluating the potential impact of risk sharing terms of the SRA.  In its models for evaluating the gain and loss sharing terms of the SRA, RMA consistently used data back to 1975, adjusted for current premiums and the current mix of business.  The final draft reflects gain and loss sharing terms that RMA expects to generate a long-term average 14.5 percent return on retained premiums.  This return is more than 2.0 percent higher than what Milliman Inc. determined in an extensive study to be a "reasonable" rate of return for the companies.  If one were to consider a shorter time frame of loss data back to 1998, the expected return is 17.7 percent on retained premium.  Although some analysts have argued that future loss experience will likely be typical of more recent experience, RMA concluded, as you also recommended, that using a longer time horizon is both prudent and more actuarially sound.

67.   During the negotiation process for the 2011 SRA, Plaintiffs and FCIC had several meetings where various SRA items were discussed.  At these meetings, Plaintiffs asked FCIC

18

directly if it was contemplating any changes to the rate setting methodology.  On each occasion,

FCIC authorized representatives said no.  For example:

> a.      On December 21, 2009, a representative of Rain and Hail (managing general agent for AIP ACE) specifically asked RMA about changes in rating methodology.  Tom Worth, Senior Actuary for RMA told Rain and Hail the existing and historically-used methodology "is the way to go" and that FCIC ratemaking was currently "in the ballpark."

> b.      On January 11, 2010, FCIC represented to 25 different commodity groups that "there was little chance for the potential for RMA's premium rating methodology study to significantly change company profitability after an SRA was finalized."

> c.      Tom Worth told the AIP A&O Risk Sharing negotiation workgroup on at least two occasions that there would be no "wholesale changes in the rating methodology" and only "minor tweaking" necessary as a result of the methodology study.  In his response, Mr. Worth specifically referred to the study that RMA had conducted relating to rating methodology.

> d.      Kendall Jones, a representative of AIP ProAg, specifically recalls an RMA representative telling the A&O/Risk Sharing Work Group that no major changes would be made to the ratemaking methodology.

68.     Upon information and belief, AIPs contend that each of the foregoing representations were made by FCIC in an effort to induce Plaintiffs to execute the SRA without a provision allowing for adjustment of its financial terms if FCIC implemented a material change in its ratemaking methodology.

69.     Had AIPs known that the premium rate setting methodology was likely to change, they would not have agreed to the underwriting gain and loss provisions included in the 2011 SRA without having a complete understanding of how such changes could impact their ability to achieve an underwriting gain, the effect on AIPs' A&O reimbursement, and the overall economic analysis of entering into the SRA.

70.     FCIC set premium rates for the 2011 reinsurance year, the first year of the 2011 SRA, consistent with the rate setting methodology historically used in the past three decades.

71.     As noted above, the financial terms and conditions of the SRA are mandated by Congress to remain the same for a five-year period. Accordingly, the financial terms and conditions of the 2011 SRA are expected at minimum to remain in place until the 2016 SRA is effective.

72.     After receipt of Study 1, and around the time that the 2011 SRA negotiations were concluding, FCIC commissioned a further study of its rate setting methodologies from the same group that had completed Study 1 ("Study 2").

73.     On August 23, 2011, over a year after the 2011 SRA went into effect, FCIC's authorized representatives told the AIPs that the results from Study 2 had been received. Prior to this date, there was no discussion between the AIPs and FCIC regarding Study 2. In a meeting with AIPs on August 23, 2011, FCIC specifically informed AIPs that adoption of the recommendations from Study 2 would result in large premium rate reductions for corn and soybean crop insurance policies. FCIC advised AIPs that they could expect premium reductions for soybeans and corn (the two most widely planted crops) planted in spring 2012 to be approximately 15% and 31%, respectively. FCIC's Manager also noted that RMA would start meeting the next day with soybean and corn grower groups to alert their members to expect substantially lower 2012 premiums. As part of the August 23 meeting, AIP representatives asked whether the premium reductions would be phased in over two or more years. The answer was negative, and AIPs were told that new rates were "loaded" and ready to be implemented. The August 23 meeting took place seven weeks after the start of the 2012 reinsurance year. That date is significant because all of the rights and obligations of FCIC and the AIPs were fixed for the next reinsurance year as of that date. In other words, AIPs had made financial commitments and put in place Plans relying on premium rates being calculated as they consistently had been

20

calculated in the past, but were told at this meeting that premium rates would be substantially lower.

74.     At the August 23, 2011 meeting, Mr. Worth of RMA/FCIC announced that the adoption of the new rating methodology as recommended in Study 2 was "a switch in methodology" that resulted in "a change in the very basis of rating" and, in response to a question or comment, also stated that the change was a "wholesale change in methodology." This was directly contrary to Mr. Worth's earlier assurances to the AIPs during the 2011 SRA negotiations that there would be no "wholesale changes in the rating methodology" and only "minor tweaking" necessary.

75.     AIPs later would learn that Study 2 had recommended a wholesale change in rate setting methodology and that FCIC had decided to implement most of those changes.   On November 28, 2011, FCIC announced certain rate changes based on the newly adopted methodology, stating that the premium rates for soybeans and corn would decrease by 7% and 9%, respectively.  These reductions were significant in that the magnitude of the change was far beyond historical rate changes, and far beyond what could have been reasonably expected by AIPs under the previously used loss cost methodology.  Further, because corn and soybeans are the nation's most widely planted crops, and hence represent the most financially important crops in the Federal crop insurance program, the rate reductions had a substantial and negative financial impact on AIPs.

76.     Contrary to FCIC's statements on August 23, 2011, the reductions for premiums for corn and soybeans were "phased in."  However, as detailed below, FCIC announced and implemented further rate adjustments on November 27, 2012 for the 2013 crop year not only for corn and soybeans, but for other spring planted crops as well.   In November 2013, FCIC

announced further rate adjustments as a result of the rate setting methodology adopted in November 2011.  The three yearly adjustments, taken together, approximate the total reduction communicated to AIPs in the August 23, 2011 meeting resulting from the adoption of the new ratemaking methodology.

77.     The initial reductions in premium rates for corn and soybeans are estimated to reduce the underwriting gain obtainable by AIPs by approximately $200 million for the 2012 reinsurance year alone.  The rate changes for 2013 and 2014 planted corn and soybeans and changes applied to other crops compound and increase this amount significantly.

78.     The magnitude of the reductions in potential compensation to AIPs threatens their ability to service adequately the nation's agricultural producers.  For this and other reasons, AIPs requested that FCIC renegotiate the underwriting gain and loss provisions of the 2011 SRA to take into account the substantially reduced premiums resulting from the newly adopted methodology that was not within the contemplation of the parties (and was specifically represented by FCIC/RMA that such would not occur) at the time the 2011 SRA was executed.  FCIC has refused to renegotiate the 2011 SRA to effectively address the damages resulting from the newly adopted methodology.

### Administrative Proceedings and Appeal

79.     On November 28, 2011, FCIC announced the adoption of the new ratemaking methodology and stated its intention to apply premium rates calculated in accordance with that methodology for the 2012 crop year and thereafter.

80.     On January 10, 2012, Plaintiffs herein sent a letter to the Deputy Director of Insurance Services of FCIC pursuant to 7 C.F.R. § 400.169 complaining that the adoption of the new rate setting methodology was contrary to the provisions of the SRA.

81.    On March 30, 2012, the Deputy Director responded to Plaintiffs' complaint denying that such adoption was contrary to the terms of the SRA.

82.    On June 27, 2012, Plaintiffs appealed that determination to the CBCA.[1]

83.    On September 29, 2013, FCIC filed a request for summary judgment in its favor before the CBCA.  FCIC included a 243 page brief and thousands of exhibits with its motion.

84.    On October 30, 2013, Plaintiffs herein responded to FCIC's motion with sworn declarations attesting to the facts as recited herein.

85.    No hearing was held at the CBCA and consequently no evidence was presented other than by way of Plaintiffs' declarations.

86.    On November 3, 2014, the CBCA denied the AIPs appeal stating that the adoption of the new ratemaking methodology did not breach the 2011 SRA.

87.    CBCA's denial of the AIPs appeal constitutes exhaustion of all administrative procedures established by the Secretary of Agriculture pursuant to 7 U.S.C. § 6912(e).

88.    Accordingly, Plaintiffs may now proceed with this action in a court of competent jurisdiction against FCIC.  7 U.S.C. § 6912(e); 7 U.S.C. § 1506(d).

## COUNT I – BREACH OF CONTRACT
### (Duty of Good Faith and Fair Dealing)

89.    AIPs reallege and incorporate paragraphs 1 through 88.

90.    AIPs are each signatories to the 2011 through 2013 SRAs with FCIC.

91.    At all times pertinent to this suit, AIPs have each performed their obligations to sell and service crop insurance policies to producers of agricultural commodities.

---

[1] Plaintiffs sent similar letters to the Deputy Director regarding changes made to premium rates in November 2012 and 2013.  After the denial of those claims, or the lack of response from FCIC, Plaintiffs filed subsequent appeals with CBCA regarding those changes.  All appeals were consolidated and a final decision on all appeals was rendered on November 3, 2014.

23

92.     Every contract, including the SRA, contains an implied duty of good faith and fair dealing. *Centex Corp. v. United States*, 395 F.3d. 1283 (Fed. Cir. 2005).

93.     The implied duty of good faith and fair dealing imposes an obligation on the part of each party to a contract to act reasonably.

94.     FCIC breached the duty of good faith and fair dealing contained in the SRA by adopting a new methodology for calculating premium rates which resulted in changing premium rates for corn and soybeans for 2012 crops; and further changing rates for 2013 and 2014 planted crops in a manner that was not within the reasonable contemplation of the parties at the time the contract was entered into, in a manner that could not be reasonably anticipated by AIPs, and in a manner that AIPs were specifically told would not occur.

95.     As a direct, proximate, and legal result of FCIC's breaches, AIPs have suffered substantial damages, and additional costs that they would not have suffered but for these breaches.

## COUNT II – PROMISSORY ESTOPPEL

96.     AIPs reallege and incorporate paragraphs 1 through 88.

97.     During the negotiation of the SRA, AIPs repeatedly asked FCIC whether any changes to FCIC's rate setting methodology were being contemplated.

98.     On each occasion when asked by AIPs, FCIC representatives with authority to speak responded that no material methodology changes were being considered.

99.     When the statements were made, FCIC representatives knew or should have known that ratemaking methodology changes were likely, knew or should have known that those changes would result in lower premiums and knew or should have known that the methodology changes would negatively impact the AIPs financially.

24

100.    FCIC knew or should have known that AIPs were likely to rely on the statements of FCIC representatives with authority to speak that no changes in rates or methodology would be implemented.

101.    FCIC knew or should have known that the statements of FCIC representatives induced the AIPs into agreeing to the financial terms of the 2011 SRA.

102.    The 2011 SRA does not include an integration clause and therefore the statements made by FCIC representatives remain binding on the FCIC and created a separate enforceable promise.

103.    AIPs reasonably relied on the statements and representations made by FCIC.

104.    But for FCIC's statements, AIPs would not have executed the 2011 SRA on the terms expressed therein.

105.    It would be unjust not to enforce FCIC's promises, statements and representations.

106.    As a direct and proximate result of FCIC's statements, AIPs have and will suffer substantial damages.

## COUNT III – UNJUST ENRICHMENT

107.    AIPs reallege and incorporate paragraphs 1 through 88.

108.    At all times pertinent to this suit, Plaintiffs have sold and serviced crop insurance policies to producers of agricultural commodities under the 2011 SRA.

109.    Plaintiffs' compensation for providing these services was unilaterally reduced by FCIC when it implemented a new ratemaking methodology in 2011 contrary to its express representation that such changes would not be made.

110.    As a result of the statements made and the inducement of the AIPs, the AIPs provided their services for at least $200 million less per year than the AIPs bargained for when the 2011 SRA was signed.

111.    FCIC/RMA received the benefit of that reduced payment to the AIPs to provide services under the financial terms and conditions set forth in the 2011 SRA.

112.    Under the circumstances, FCIC's retention and use of at least $200 million per year savings is unjust.

113.    As a direct and proximate result of FCIC's statements, AIPs have and will suffer substantial damages.

### COUNT IV – VIOLATION OF 7 U.S.C. § 1508(k)(8)

114.    AIPs reallege and incorporate paragraphs 1 through 88.

115.    Congress mandated that FCIC may renegotiate "the financial terms and conditions of each Standard Reinsurance Agreement…once during each period of 5 reinsurance years…. 7 U.S.C. § 1508(k)(8).

116.    Premium rates and the underlying methodology used to determine them are incorporated into each financial term and condition of the SRA.

117.    As a result, a change in rate setting methodology results in a change to the financial terms and conditions of the SRA.

118.    Because the 2011 SRA became effective July 1, 2010, FCIC lacked authority to change the financial terms and conditions of the 2011 SRA until July 1, 2015 pursuant to 7 U.S.C. § 1508(k)(8).

119.    The premium rate reductions implemented by FCIC have caused substantial damage to AIPs.

26

120.    As a result, the Court should award damages to AIPs based on the difference between underwriting gain at the historically calculated premium rates versus the underwriting gain calculated at the rates subsequently implemented after adoption of the new methodology.

## COUNT V –VIOLATION OF 7 U.S.C. § 1508(k)(3)

121.    AIPs reallege and incorporate paragraphs 1 through 88.

122.    7 U.S.C. § 1508(k)(3) provides: "The reinsurance agreements of the Corporation with the reinsured companies shall require the reinsured companies to bear a sufficient share of any potential loss under the agreement so as to ensure that the reinsured company will sell and service policies of insurance in a sound and prudent manner, taking into consideration the financial condition of the reinsured companies and the availability of private reinsurance."

123.    The 2011 SRA is a reinsurance agreement between FCIC and the AIPs.

124.    When FCIC adopted wholesale changes in the rating methodology, FCIC failed to consider the financial condition of the AIPs and the effect that such changes in ratemaking methodology would have on the AIPs.

125.    By failing to consider the financial condition of the AIPs when the ratemaking changes were implemented, FCIC violated 7 U.S.C. § 1508(k)(3).

126.

127.    The AIPs suffered significant damage as a result of the violation of 7 U.S.C. § 1508(k)(3).

## COUNT VI – REFORMATION AND RESCISSION

128.    AIPs reallege and incorporate paragraphs 1 through 88.

129.    The mutual understanding by both FCIC and AIPs that FCIC's then current rate setting methodology was sound constituted a material premise underlying the SRA executed as

of July 1, 2010.  But for this understanding, AIPs would not have entered into the 2011 SRA on the terms contained therein.

130.    The understanding was material in that the difference in assumed underwriting gain is estimated to be approximately $200 million, or more, per year calculated using new premium rates versus historical rates.

131.    The risk of the mistake was not on the AIPs in that there is no provision of the SRA where AIPs assumed such a risk of change of methodology, and no course of dealing where it could be implied that AIPs assumed the risk of change.

132.    The SRA does not contain an integration clause and therefore FCIC's prior representations that there would be no material change in the rate making methodology remains binding on FCIC.

133.    As a result, the Court should order that the SRA be rescinded and/or reformed to provide the same underwriting gain to AIPs that would have been achieved by AIPs had premium rates been calculated consistently with the prior methodology as opposed to the new premium rates based on the changed methodology.

## COUNT VII – DECLARATORY JUDGMENT

134.    AIPs reallege and incorporate paragraphs 1 through 88.

135.    In its November 3, 2014 Order, the CBCA determined that there had been no breach of the 2011 SRA or violation of 7 U.S.C. § 1508(k).

136.    The CBCA's determination of the absence of breach of the SRA relied on the fact that RMA was authorized by statute to adjust premium rates.

137.    In addition, the CBCA determined that FCIC's conduct did not amount to a violation of the FCIA.

138.    The Board's conclusion is not supported by the record before it.   Indeed, the Board's decision lacked citation to uncontroverted evidence, failed to draw reasonable inferences in favor of Plaintiffs and is otherwise not in accordance with the law.

139.    The CBCA Order does not address any of the facts presented by the AIPs including the AIPs' Opposition to Motion for Summary Judgment that listed twelve pages of material facts in dispute and is therefore procedurally flawed.

140.    The CBCA's conclusion with respect to breach of the 2011 SRA also demonstrates a lack of understanding of Plaintiffs' claims. Plaintiffs have never alleged that FCIC was unable to adjust premium rates — only that the manner in which it made those changes as evidenced by the uncontroverted facts amounted to a breach of the SRA. Substantively, the AIPs complaint addresses the effect that the change in rating methodology had on the financial terms and conditions of the SRA.   This was not addressed at all in the CBCA Order.  In its Order, the Board failed to substantively address Plaintiffs' claims.

141.    The CBCA Order ignored the central legal premise, set forth in the *Winstar* cases, that even if an action is statutorily authorized, there may still be damages due and owing for contract breach as a result of the statutorily authorized action.

142.    In addition, CBCA's determination that FCIC's adoption of a new ratemaking methodology did not violate the FCIA is beyond the CBCA's jurisdiction.  CBCA jurisdiction is limited to breach of contract actions.  It does not extend to statutory violations.

143.    Accordingly, Plaintiffs' request, in the alternative, that this court declare, pursuant to 28 U.S.C. § 2201, that the CBCA's  grant of summary disposition in favor of FCIC is erroneous as a matter of law.

29

WHEREFORE, Plaintiffs ACE, American Agri-Business, American Agricultural, GuideOne, Country Mutual, Everest, Farmers Mutual, Great American, Hudson, NAU, Occidental, Producers, and Rural Community demand judgment against FCIC as follows:

For Counts I-V:

1.    Awarding Plaintiffs compensatory damages in the amounts to be proved at trial;

2.    Awarding Plaintiffs their attorney fees and costs; and

3.    Granting Plaintiffs any and all other such relief that the Court deems proper and just.

For Count VI:

1.    Rescinding and/or reforming the SRA to provide the same underwriting gain to AIPs that would have been achieved by AIPs had premium rates been calculated consistently with the prior methodology as opposed to the new premium rates based on the changed methodology;

2.    Awarding Plaintiffs their attorney fees and costs; and

3.    Granting Plaintiffs any and all other such relief that the Court deems proper and just.

For Count VII:

1.    Declaring that the CBCA Order dated November 3, 2014 was erroneous;

2.    That this court conduct further proceedings on Plaintiffs' claims presented to CBCA pursuant to 28 U.S.C. § 1367 as all claims before the court involve the same operative facts and evidence such that they form the same case or controversy before the court;

3.    Awarding Plaintiffs their attorney fees and costs; and

DB04/0763432.0033/11514136.2

4.      Granting Plaintiffs any and all other such relief that the Court deems proper and just.

Trial by jury is hereby demanded for all issues so triable.

Respectfully submitted this 24th day of November, 2014.

STINSON LEONARD STREET LLP

By: /s/ Michael E. Tucci
      Michael E. Tucci (D.C. Bar # 430470)
      1775 Pennsylvania Avenue, NW, Suite 800
      Washington, D.C. 20006-4605
      (202) 785-9100; Fax: (202) 572-9964
      michael.tucci@stinsonleonard.com

      Lawrence P. Block (D.C. Bar # 452190)
      1775 Pennsylvania Avenue, NW, Suite 800
      Washington, D.C. 20006-4605
      (202) 785-9100; Fax: (202) 572-9993
      lawrence.block@stinsonleonard.com

Counsel for all Plaintiffs

CHARLES D. LEE

By: /s/ Charles D. Lee by Michael E. Tucci
      Charles D. Lee (KS Bar #10277; CO Bar
      #25904
      National Crop Insurance Services, Inc.
      8900 Indian Creek Parkway, Suite 600
      Overland Park, KS  66210
      (913) 685-2767
      Fax:  (913) 685-3080
      Chuckl@ag-risk.org

Counsel for all Plaintiffs

Of Counsel:

Daniel N. Rosenstein (D.C. Bar # 434302)
Levin & Rosenstein
1395 Piccard Drive, Suite 110
Rockville, MD 20850
(301) 208-1795
Fax:  (301) 208-1855
dan@levinrosenstein.com

Additional Counsel for Rural Community Insurance Company


Michael J. Davenport
Rain and Hail LLC
9200 Northpark Drive, Suite 300
Johnston, IA 50131
(515) 559-1510
Fax:  (515) 559-1135
michael.davenport@rainhail.com

Bradley A. Meyer, CFE
Associate General Counsel/SIU Manager
Rain and Hail LLC
9200 Northpark Drive, Suite 300
Johnston, IA 50131
(515) 559-1096
Fax:  (515) 559-1135
brad.meyer@rainhail.com

Additional Counsel for Ace American Insurance Company


Zane J. Vaughn
General Counsel
American Agri-Business Insurance Company
7101 82nd Street
Lubbock, TX 79424
(806) 784-3423
Fax:  (806) 473-0334
zvaughn@armt.com

Additional Counsel for American Agri-Business Insurance Company

DB04/0763432.0033/11514136.2

Grant Adams
Executive Vice President and General Counsel
Producers Agriculture Insurance Company
2025 S. Hughes Street
Amarillo, TX 79109
(806) 372-6785
Fax:  (800) 755-7026
grant@proag.com

Additional Counsel for Producers Agriculture Insurance Company


Douglas M. Jakway
SVP/General Counsel
NAU Country Insurance Company
733 Sunwood Drive
Ramsey, Minnesota 55303
(763) 427-3770
Fax:  (763) 427-6473
Doug.jakway@naucountry.com

AdditionalCounsel for NAU Country Insurance Company

DB04/0763432.0033/11514136.2