## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Ace American Insurance Co., et al.,** ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **Civil Action No. 14-1992 (RCL)** |
| **Federal Crop Insurance Corp., et al.,** ) | |
| **Defendants.** ) | |

## CORRECTED STATEMENT OF FACTS[1]

In support of their motion for summary judgment, Defendants Federal Crop Insurance Corporation ("FCIC") and Risk Management Agency (RMA) (collectively referred to herein as "RMA") submits this statement of facts.

**Historical Rating Changes and Standard Reinsurance Agreement Renegotiations**

1.      In accordance with section 508(d) of the Federal Crop Insurance Act ("Act") (7 U.S.C. § 1508(d)), RMA sets the rates to target a loss ratio of 1.0 and to cover expected indemnities and a reasonable reserve (Civilian Board of Contract Appeals (CBCA) Administrative Record ("R.") Tab 26, Ex. 10, Tom Worth Dep., p. 93, 110-111, 151, 158, 166).

2.      RMA historically has conducted periodic rate methodology reviews similar to the one at issue in this case without regard to the timing of the negotiations of the Standard Reinsurance Agreement ("SRA") (R. Tab TT, p. FCIC0083953-FCIC0084154; Tab C5, p. 212-261; Tab 26, Ex. 10, Tom Worth Dep., p. 49).

3.      The SRAs were renegotiated for the 1995, 1998, 2005, and 2011 reinsurance years.  See http://www.rma.usda.gov/pubs/ra/sraarchives/index.html;

http://www.rma.usda.gov/news/managers/1996/mgr96070.txt.

4.      Rate methodology reviews were conducted in 1996 and 2000, and entailed looking at various aspects of the rating methodology, including the catastrophic loading (R. Tab C5, p. 231;

---

[1] The Statement of Facts filed earlier tonight inadvertently did not include sequential numbering.

Tab TT, p. FCIC83961-FCIC83963), coverage level differentials (R. Tab C5, p. 247; Tab TT, p.

FCIC83988- FCIC84014), the rating period (R. Tab C5, p. 229; Tab TT, p. FCIC84111-

FCIC84113), and the weighting of more recent data (R. Tab C5, p. 230; Tab TT, p. FCIC84112).

5.      RMA also has reviewed some aspects of its rating procedures annually, and makes

appropriate changes without regard to the timing of the negotiation of the SRA, so that the rates

reflect the risks (R. Tab C1, p. 136-168; Tab C6, p. 262-385; Tab D1, p.  941-1066; Tab D2, p.

957-959; Tab D3, p. 961, 965, 969; Tab E, p. 1258, 1432; Tab F, p. 1429-1430, 1432,1436-1437,

1438, 1441, 1460-1492, 1511-1513; Tab K1, p. 2150-2151; Tab TT, p. FCIC0083510,

FCIC0083513-FCIC0083515, FCIC0083703- FCIC0083752, FCIC0083579-FCIC0083585,

FCIC0083586- FCIC0083702, FCIC0083582, FCIC0083585, FCIC0083584- FCIC0083585,

FCIC0083703- FCIC0083704, FCIC0083732- FCIC0083733, FCIC0083758, FCIC0083942,

FCIC83945, FCIC83946-48, FCIC83949; Tab 26, Ex. 9, Bill Murphy Dep., p. 169).

6.      Since 1996, RMA has continued to use the loss cost methodology, but adjustments must

be made within the methodology to obtain premium rates for individual producers and to provide

more accurate rates (R. Tab C5, p. 212-261; Tab K1, p.  2150-2151; Tab XX, p. AIP00010649;

Tab 26, Ex. 10, Tom Worth Dep., p. 103-104, 142; Ex. 12, Tim Witt Dep., p. 51, 81).

7.      Based on its historical experience, RMA has been adjusting its rating methodology for

years (R. Tab C5, p. 212-261; Tab E, p. 2150-2151; Tab XX, p. AIP00010649).

8.      Regardless of when the SRA was negotiated, premium rates change every year due to

improvements in the methodology (R. Tab C1, p. 136-673; Tab 26, Ex. 9, Bill Murphy Dep., p.

160; Ex. 10, Tom Worth Dep., p. 103-104, 186).

9.      RMA reviews each crop's premium rates on a 3 to 5 year cycle, and thus rate changes are made annually to one or more crops (R. Tab F, p. 1433; Tab C1, p. 136-673, Tab C15, p. 728-836).

10.     RMA and others have understood that the rating process was separate from the renegotiation of the SRA (R. Tab TT, p.  FCIC0009383; Tab XX, p. AIP00025036, AIP00240645; Tab 26,  Ex. 5, Kent Lanclos Dep., p. 35; Ex. 9, Bill Murphy Dep., p. 70, 167-168; Ex. 10, Tom Worth Dep., p. 93-94, 95, 134-135, 151).

11.      In June 2008, plaintiffs stated:

> **Issue 3: Should the industry push in the SRA negotiations to be more formally involved in (1) determining premium rates and more transparency in the rate process and (2) development of policies and procedures more generally?**
>
> The current SRA provides no provisions for involvement of AIPs in rates, policies and procedures.

(R. Tab YY, p. NCIS00037711).

12.     At the same meeting plaintiffs also stated:

> The Board[2] may want to determine if some form of increased involvement in rate determination is desirable. The Board could take no position on rate issues. Choosing the status quo would leave rates in RMA's hands, with AIPs offering advice on a case-by-case basis, with RMA having no obligation to act or even respond to the suggestions. Alternatively, the Board could direct that some increased involvement in advising RMA be pursued. This involvement could range from limited to substantial, but would obligate RMA to respond. Regardless of the level of involvement in rate determination, greater transparency could be expected from any more formal involvement by AIPs. It seems unlikely that the AIPs could pursue increased actuarially appropriateness without RMA responding with increased transparency in rate determination. Alternatively the Board may want to consider some method that would allow AIPs the flexibility to make limited changes up or down from RMA-established rates (similar to options such as PRP or the premium reduction pilot, both abolished in the 2008 Farm Bill).

---

[2] This refers to the Board of Directors of the National Crop Insurance Services (NCIS), an organization that represents most, if not all, of the plaintiffs.

(R. Tab YY, p. NCIS00037712).

13.     On or about September, 12, 2008, plaintiffs stated:

> It is solely up to RMA to decide what premium rates will be in effect (although FCIC may approve submitted rate proposals for new products or changes in existing products approved under Section 508(h) of the Federal Crop Insurance Act). With the rising concerns over regional premium rate equity and the immense challenge RMA faces in establishing hundreds of thousands of rates each year, new approaches to setting premium rates should be adopted. RMA would benefit from new approaches that better use existing data and approaches that may bring new information to the rate setting process.

(R. Tab YY, p. NCIS00037731).

14.     On or about October 8, 2009, plaintiffs stated:

> Major changes to RMA's rates or ratemaking methodology implemented as a result of the contracted study may affect the rate adequacy of the program as a whole. These changes may also affect the risk-return tradeoff of the program on a net of reinsurance basis. Due to the timing of the release of the report, these changes are outside of the scope of the SRA renegotiations.

(R. Tab YY, p. NCIS00004853).

15.     On July 7, 2010, plaintiffs were again discussing the premium rate changes from the premium rate methodology review (hereinafter "Review"), and a representative of plaintiffs stated, "No, I haven't talked to any of the people responsible for implementing the change. Worth seemed to be unsure whether it would take place in 2011 or 2012." (R. Tab XX, p. NCIS00049065).

16.     In September 2011, a representative of plaintiff, Rain and Hail L.L.C. ("Rain and Hail"), stated:

> Bob - I have dug through all of our official comments to the 2011 SRA drafts and cannot find anything specifically talking about the rates. I assume there is nothing specific about the rates since they are not actually a part of the SRA. I am also guessing that the subject came up in the various meetings that you guys had with RMA throughout the negotiations as a sidebar to the SRA; the problem is being fixed in multiple ways, however I wasn't involved in those meetings so don't have any notes. I did find some of Tom's notes from an April 2009 meeting (well before the first draft in Dec 09) with SRA regarding rates. These are attached

> (Rebalancing...pdf)....  Though they are not associated with the 2011 SRA directly
> I thought you might want to take a look.

(R. Tab XX, p. AIP00242596).

17.  In November 2011, plaintiffs commented internally regarding RMA's intended rate changes,

stating:

> Not public yet, but a reliable source is indicating the proposed re-rating will be
> delayed, but a national rate reduction in the 4-9% range will be recommended for
> corn and beans. This would impact us, but is no different than a usual rate
> reduction which we have never known in advance for budget.

(R. Tab XX, p. AIP00009017-AIP00009019).

18.   RMA does not negotiate premium rates, but rather premium rates reflect risk, and under

section 508(d) of the Federal Crop Insurance Act (FCIA or Act), it is solely the responsibility of

RMA to set the premium rates.  (Tab A, p. 23; Tab 26, Ex. 9, Bill Murphy Dep., p. 168-169).

19.   Plaintiffs acknowledged that rate changes are only limited by the Act (R. Tab TT, p.

FCIC0083828, FCIC0083831, FCIC0083833, FCIC0083841).

20.   The only limitation in the Act regarding the setting of premiums is in section 508(i)(1),

which limits any premium increase to 20 percent over the comparable rate the preceding year (R.

Tab A, p. 33-34).

21.   Plaintiffs acknowledged that RMA's changes in the 2012 premium rates for corn and

soybeans did not violate the Act or regulations (R. Tab TT, p. FCIC0083863-FCIC0083864).

**2011 SRA Renegotiations and Rate Methodology Review Chronology**

22.   During and after the enactment of the Food, Conservation, and Energy Act of 2008 (2008

Farm Bill), Congress and others raised concerns regarding RMA's premium rates and whether

they were too high in certain states and for certain crops (R. Tab E, p. 1073-1074, 1108-1109,

1134-1136, 1140-1145, 1226-1227, 1375-1378; Tab MM, p. 5334-5336).

23.     Based on such concerns, prior to August 2008 RMA began the public contracting process for the Review, which is an independent, comprehensive review of RMA's premium rating methodology, including for crops such as corn and soybeans (R. Tab E, p. 1067-1070, 1092-1107, 1139, 1230-1232, 1235-1269; Tab MM, p. 5261-5277).

24.     One of the express mandates of the Review was to look at historical experience (R. Tab MM, p. 5286, 5289).

25.     Around February 2009, both RMA and the plaintiffs began their preparations for the negotiations of the 2011 SRA (R. Tab XX, p. AIP11205-11245, Tab TT, p. FCIC11876-80).

26.     Around March 2009, a contract was awarded to Sumaria Systems, Inc. (Sumaria) to undertake the Review (R. Tab E, p. 1270-1274, 1294-1316; Tab MM, p. 5287).

27.     A kick-off meeting was held with Sumaria to discuss the specifics of the contract that emphasized the need to look at the historical experience when reviewing the rating methodology (R. Tab E, p. 1235-1248).

28.     In June and August 2009, RMA received studies from Milliman, Inc. (which company RMA had contracted to determine what would be a reasonable rate of return for the plaintiffs in the crop insurance program), entitled "The Historical Rate of Return Analysis" (R. AIP251234-76) and "Rate of Return Update 2008: Reasonable Rate of Return" (R. AIP251277-314), in which Milliman concluded that the reasonable rate of return was 12.8 percent, but that plaintiffs historically had averaged 16.6 percent (R. AIP00251237, AIP00251261, AIP00251267).

29.     On or about September 17, 2009, RMA met with plaintiffs and informed them:

> University of Illinois group asking questions regarding the premium rates in the program. Timeline of study, November presentation to board with study released to public for comment, comments relayed back to group doing study, then final study will be released. Scope is focused on the APH methodology, combo revenue, not AGR.

(R. Tab TT, p.  FCIC0082201).

30.     The plaintiffs also asked how the results of the Review would affect the profitability of

the crop insurance program, and stated that going forward if the rates change it could affect the

profitability of the program (R. Tab TT, p. FCIC0082201).

31.     On or about September 28, 2009, plaintiff's representative, Rain and Hail,

identified issues for the 2011 SRA, including:

> The study of RMA's rates may result in a lowering of rates, which will
> correspondingly increase loss ratios. This could compound/double up with a
> reduction in profit potential, along with resulting increased stop loss cost/reduced
> quota share reinsurance terms.

(R. Tab XX, p. AIP00239208).

32.     On or about September 29, 2009, the plaintiffs' A&O (Administrative and Operating

Expense) and Risk Sharing working group met and recognized that rate adequacy was an issue

and there could be future rate changes (R. Tab XX, p. AIP00009419).

33.     On or about October 7, 2009, RMA attended a roundtable session with agents and

plaintiffs, the Review was discussed, and RMA stated that it would try to have it published on

the website by November 30, 2010 (R. TT, p. FCIC53866; FCIC44089; Tab XX, p. AIP9517-

18).

34.     On or about October 19, 2009, NCIS provided recommendations to RMA for the

negotiations for the 2011 SRA from five working groups, stating that:

> The working group also recognized that a fundamental change in premium rate
> methodology would nullify the expected financial outcome of an SRA. To address
> this issue, the SRA should allow for reconsideration of the reinsurance provisions
> following significant rate changes or the implementation of revised ratemaking
> methodologies.

(R. Tab XX, p. AIP00239367; NCIS00043116).

35.     In its October 19, 2009 communication, NCIS also suggested having options in the SRA

to address changes in rate adequacy, stating:

### *Provide an option in the SRA to address changes in rate adequacy*

**Background**: FCIC/RMA recently issued a contract for an examination of all aspects of its rating methodology. The report summarizing the contractor's analysis is expected to be released in early 2010. Any modifications to rates or ratemaking methodology would be implemented after the signing of the SRA.

**Issue**: AIPs make their fund assignment decisions based on the expected profitability and risk of the insured policies. However, the underlying profitability of the business can be affected by FCIC/RMA decisions that materially change the rates being charged. The industry is concerned that the contracted study of rating methodology may have a material effect on future rates and profitability of the program. Due to the timing of the release of the study, these changes are outside of the scope of the current SRA renegotiations. Wholesale revisions to the rates or rating methodology may impact an AIP's ability to make optimal fund assignment decisions, adequately manage its risk, or achieve a competitive rate of return.

**Recommendation**: The industry's ability to renegotiate the SRA is based on the presumption that the profitability of the program will be unaffected by subsequent actions taken by FCIC/RMA. Negotiations would be rendered irrelevant if the private sector's opportunity to earn a profit could be altered at the government's discretion following the signing of the SRA. In particular, if the contracted rate study leads to a major realignment of rates or the introduction of a revised rating methodology, it has the potential of adversely affecting the future profitability of the program. This concern should be addressed by including a stipulation in the SRA that allows for modification of the reinsurance provisions to maintain the level of underwriting income expected at the time the SRA is signed. Modifications would be triggered by significant rate changes, revisions to the current rating structure, or the implementation of a revised ratemaking methodology. The language could be designed to exclude normal rate change activity from consideration. To distinguish between normal rate changes and major rate realignments, FCIC/RMA would be required to release an annual report documenting base rate change activity by state, crop, and plan of insurance. The report would provide annual rate changes as well as cumulative rate changes from a base year (2010). Normal rate activity would be those changes whose annual and cumulative effects are within a mutually agreed upon threshold.

(R. Tab XX, p. AIP00239377-AIP00239378, AIP00245918-AIP245919).

36.     On or about October 22, 2009, plaintiff Country Mutual Insurance Company ("Country

Mutual") created a paper called "SRA Negotiation Meeting with RMA," and one of the items

was:

> (a) Drop rates in IL, IN & IA. Don't cost the government more money
> (i) Status of analysis
> (ii) Likelihood of lower rates
> (iii) What crop year?

(R. Tab XX, p. AIP00006491-AIP00006492).

37.     Sumaria provided a final draft of its report for the Review, which document was received

by RMA on October 22, 2009 (R. Tab F, p. 1395-1517).

38.     On or about October 23, 2009, Country Mutual talked about its meeting with RMA,

noting:

> The RMA does have an objective to simplify the SRA so that others are more able
> to understand it, but they did not seem as receptive to the rating issues. They did
> talk about the rate study they are working to complete and a report will be
> published on the RMA website by early December, but it did not sound to me like
> they expect any revisions that they could not handle within their existing structure
> (which to me means minimal change likely). It was obvious they did not have a
> good perspective of the "regional" company or in our case one state company, and
> they seemed to listen to what we had to say.

(R. Tab XX, p. AIP00006558).

39.     On November 30, 2009, RMA announced the availability of the draft Review and

requested public comment (originally due January 4, 2010, but later extended to January 19,

2010) through Informational Memorandum PM-09-056, available on RMA's website at

http://www.rma.usda.gov/bulletins/pm/2009/09-056.pdf. (R. Tab J, p. 1839-1841; Tab XX, p.

AIP00020463).

40.     On or about December 4, 2009, RMA released the first draft of the 2011 SRA through

Bulletin MGR-09-11 (R. Tab XX, p. AIP17609-10, AIP17624-69; AIP17611-23, AIP17670-96;

AIP17697-711), and plaintiffs had until January 15, 2010, to provide comments, but that deadline was extended to the close of business on January 19, 2010 (R. Tab TT, p. FCIC16083-90, FCIC16160-69, FCIC16471-78).

41.     In the first draft of the 2011 SRA, RMA:

a.      Used the 12 percent reasonable rate of return recommended by the Milliman report as a tool for measuring the reasonableness of its gain and loss provisions (R. Tab TT, p. FCIC0036836, FCIC0045158);

b.      Revised the administrative and operating subsidy (A&O) structure to use a reference price for the seven major commodities that would stabilize the price used to calculate premium, which would reduce A&O from the amount under the prevailing SRA, but which would be increased over amounts paid for A&O prior to 2007 (R. Tab TT, FCIC0015220-FCIC0015226).

c.      Reduced the number of Funds and sub-funds used to calculate underwriting gains/losses from 350 to 51, and eliminated the Assigned Risk Fund and replaced it with a Residual Fund, in which all gains and losses are pooled at the national level and shared by all plaintiffs (R. Tab TT, FCIC0015221- FCIC0015222, FCIC0015227-FCIC0015228).

d.      Divided the states into pools with different risk sharing to spread the gains and losses geographically so as to give plaintiffs incentives to sell in underserved areas, which modification included RMA taking a greater share of the gains and catastrophic losses so that the underwriting gains/losses would be more balanced between years (R. Tab TT, FCIC0015221- FCIC0015222, FCIC0015228-FCIC0015232).

e. Increased the Net Book Quota Share plaintiffs paid to RMA for premium in excess of their underwriting capacity from 5 to 10 percent, with a share of these funds

being returned to plaintiffs that serve underserved states (R. Tab TT, FCIC15221-22, FCIC15228).

42.     On or about December 9, 2009, Country Mutual commented internally on the first draft of the SRA, stating:

> If the rebalance the states with combo policy introduction and new rating methodology and this SRA holds we will need to decide if we can breakeven over time and what to do to tie our expenses in with an indexed A&O. Looks like I got an additional 2010 objective!

(R. Tab XX, p. AIP00006706).

43.     On or about December 17, 2009, RMA staff discussed the Review, and RMA's plans for pursuing the Review's recommendations, with the NCIS Multiple Peril Crop Insurance (MPCI) Actuarial and Statistical (A&S) Committee (R. Tab J, p. 1844).  Most of the plaintiffs either had staff present at the meeting or participated by teleconference (R. Tab NN, p. 5368-5371).

44.     At the December 17, 2009 discussion, as to medium-term issues, RMA summarized the recommendations of (1) reweighting of historical experience and recasting the experience to better reflect the types and practices currently used by producers, the need to have historical experience reflect the different experiences between the unit structures, that a high priority was weighting weather events to better reflect their likelihood of occurrence using models that can apply to a variety of APH crops, and that separate from reweighting of the historical experience, RMA was considering building the Biotechnology Endorsement discounts into the base rates; (2) for risk classifications, basing reference yields on APH data and revising exponents to better match actual experience; and (3) looking at the overall experience to see if there is bias, whether it can be addressed by a top down approach or whether a correction is necessary to offset the bias, and revising the base coverage level from 65 to 50 percent (R. Tab NN, p. 5370).

45.     At the December 17, 2009 discussion, RMA stated that reweighting of the data is also a

high priority (R. Tab NN, p. 5370).

46.     On December 21, 2009, Rain and Hail made a presentation to RMA, at which Rain and

Hail asked about the Review, and RMA told it:  "Pertaining to the study, overall the

methodology is the way to go and we are in the ballpark and that's not to say that it can't be

improved, there is a list of suggested improvements" (R. Tab TT, p. FCIC0082193,

FCIC0044857-FCIC0044866; FCIC0082187-FCIC0082218; Tab XX, p. AIP00238393-

AIP00238409).  (See also Tab 26, Ex. 10, Tom Worth dep., p. 71, 76-77, 86, 97, 131, 142).

47.     On or about December 22, 2009, in accordance with the provisions of the 2010 SRA,

RMA announced that it was not renewing the current SRA for the 2011 reinsurance year through

Bulletin MGR-09-12 (R. Tab XX, p. AIP00018770).

48.     On or about December 28, 2010, ADM Crop Risk Services (ADM), on behalf of

Agrinational Insurance Company, Inc., analyzed the December 17, 2009 MPCI A&S conference

call on the RMA ratemaking study (R. AIP00223128).  It stated:

> CAT[3] changes will likely reduce our premium and the loss ratio will go up. Since
> it is 100% subsidized the farmers will still want it. Underwriting Gain will likely
> go down slightly because of it. In the past CAT has only been 4% of our book.
>
> Combo Revenue rates will replace RA and CRC Our CRC insureds will probably
> have to pay more in premium. Could increase Underwriting Gain slightly.
>
> It is difficult to predict how the rest of the changes will impact us because right
> now the details are vague. It just reads as though they are considering updating
> their methods for determining historical experience and risk classes. Something
> that they probably need to do as over time you have more data to work with and
> old methods are no longer as relevant as they once were.

(R. Tab XX, p. AIP00223128).

---

[3] CAT is catastrophic risk protection, the lowest level of coverage offered under FCIA § 508(b).

49.     On or about January 13, 2010, the NCIS' MPCI A&S Committee had a conference call,

in which it was stressed that the Biotech Endorsement is an ad hoc discount in rates that in its

view is not justified by any research or empirical evidence and can make the APH method

obsolete, and as to which staff expressed the view that it is not clear how RMA will shrink that

discount over time as the adoption of these bio-tech traits increases.

50.     On or about January 13, 2010, the NCIS' MPCI A&S Committee and staff discussed

whether the ratemaking study was as anticipated, and staff expressed the view that the study was

as expected, although NCIS staff asserted that it had a few shortcomings.  (R. Tab XX, p.

AIP00020378-AIP00010379).

51.     Plaintiffs also commented:

> Hopefully you have all seen the attached draft study RMA commissioned on
> Rating methodology; frankly the report provides some insite (sic) but calls for a
> lot of additional study. The one thing that is missing is a conclusion regarding rate
> adequacy on any discussion at all with regards to whether the program is properly
> rated.

(R. Tab XX, p. AIP00144193) (Code removed for clarity).

52.     RMA notified NCIS that it was compiling the comments it had received about the

Review, sending them to Sumaria for inclusion into the final report, and RMA agreed to meet

with NCIS after the Final Review was posted, stating it wanted to be a transparent as possible in

the process (R. Tab NN, p. 5374-5378, 5382; Tab K, p. 1958).

53.     RMA also provided information to the public through a DTN insurance price blog,

stating:

> RMA has had an external panel of experts review its premium rating
> methodology.
>   o  The review found that the methodology for developing premium rates was
>      generally appropriate.
>   o  The review recommended that the loss cost history (which is the basis for
>      premium rates) be reviewed with respect to longer term data (such as

weather). This would provide a basis to re-weight some of the catastrophic events contained in the loss cost data. It would also provide a basis to revise the observed severity of past catastrophic events in light of today's insurance program and crop production technology.

    o   RMA is currently pursuing the review of its loss cost data. To the extent that catastrophic events are over-represented in the loss cost data, the loss cost review would be likely to result in lower rates.

(R. Tab K1, p. 2176-2177).

54.     In February 2010, RMA also began the process for contracting for a study on weighting the historical experience (R. Tab J, p. 1854, 1955-1956, 1970; Tab L, M1, M2, p. 2184-2215, 2216-2247; Tab NN, p. 5378-5381, 5383; Tab OO, p. 5388).

55.     On or about February 11, 2010, the Manager of FCIC issued the Manager's report to the FCIC Board of Directors (a document posted on the RMA website) and in that report stated:

> **Rate Methodology Study** - RMA awarded a contract for a comprehensive review of the APH and COMBO rating methodology. The subsequent report was received by RMA and was posted for comment in December, 2009. Comments were received by January 19, and are under review. One of the key recommendations of the report was that RMA should conduct an in-depth review of historical loss data with special emphasis on the issues of whether all years should be weighted equally, especially the early years; and whether the historical data give a reasonable prediction of future losses. RMA is in the process of contracting for this review.

(R. Tab XX, p. AIP00252333).

56.     On or about February 16, 2010, NCIS was in a meeting with the National Corn Growers, which discussed changes in ratemaking to account for the excellent performance of corn over the past decade, and NCIS conducted an analysis of the performance of corn and soybeans and concluded that corn has performed better in Iowa and Minnesota but it was less clear in Illinois, Indiana, and Nebraska, so it was not totally convinced of the lower corn risks and wanted to look at a longer time series (R. Tab YY, p. NCIS00024242, NCIS00024243-NCIS00024250).

57.     On or about February 17, 2010, RMA made a presentation to the plaintiffs regarding the changes expected in the second draft of the 2011 SRA (R. Tab XX, p. AIP00155439-AIP00155454).

58.     On or about February 23, 2010, RMA released the second draft of the 2011 SRA through Bulletin MGR-10-02, and the deadline for making comments was March 22, 2010, but the deadline was later extended to April 9, 2010 at the request of the plaintiffs (R. Tab XX, p. AIP00024833-AIP00024834; AIP00029255-AIP00029300, AIP00029236-AIP00029254; AIP00028996-AIP00029105, AIP00028970-AIP28983, AIP00028932-AIP00028950, AIP00026306, AIP00230655; Tab TT, p. FCIC0041261).

59.     RMA not only considered all the comments from the plaintiffs and others when drafting the second draft of the 2011 SRA, but it also made substantive changes as a result of those comments (R. Tab TT, p. FCIC11393-95, FCIC13679-83, FCIC13833, FCIC13835-40, FCIC13853-FCIC54, FCIC13905- FCIC06, FCIC14564, FCIC29113-303, FCIC34543-44; FCIC35264-FCIC72; FCIC36655- FCIC65, FCIC36796-97, FCIC44957-60), inter alia:

     a.     RMA revised the gain and loss percentages in the new groups, which increased the gains and decreased the losses as compared to the first draft (R. Tab YY, p. NCIS00043494).

     b.     RMA incorporated a two year transition period for plaintiffs to fully adjust to the new A&O subsidy structure, and the reference price was increased 10 percent higher than the first draft, and then 5 percent higher in 2012, until base references prices are reached for 2013 (R. Tab XX, p. AIP26177).  The second draft also provided for 5 percent higher reference prices for underserved and less-served States (State Groups 2 and 3) (R. Tab XX, p. AIP26178).

60.     On March 9-10, 2010, plaintiffs' Risk Sharing and A&O working group met internally, and the minutes of that meeting state:

> The potential impact of ratemaking methodology changes arising out of the recent RMA ratemaking study on future underwriting gains was discussed. The workgroup revisited the industry's proposal from the October 19, 2009 "Recommendations for the Standard Reinsurance Agreement" as a possible means to address this issue.

(R. Tab YY, p. NCIS00001971).

61.     On March 10, 2010, all SRA working groups, comprised of RMA and plaintiffs' personnel, met in Kansas City to discuss the second draft of the 2011 SRA, and plaintiffs asked whether there was a fundamental change in the rating methodology coming, to which RMA responded:

> We are looking at reducing CAT rates significantly and have enough data. CAT rates are considerably higher than they should be. What we will be looking at is loss cost data and staying with that methodology. We a have no plans to change that. But there have been recommendations to improve our methodology; they are out on our website.

(R. Tab XX, p. AIP00229897; Tab TT, p. FCIC0082226).  (See also Tab XX, p. AIP00155214; Tab YY, p. NCISO0009393, NCISO0009395).

62.     On or about March 15, 2010, Sumaria provided its Final Review, including its responses to the public comments (R. Tab K, p. 1990-2146, 2147-2166; Tab OO, p. 5385-5387).

63.     On or about March 18, 2010, Country Mutual was drafting its comments to the second draft of the SRA and stated:

> With the 2010 crop year it is our understanding that RMA intends to introduce a Common COMBO policy rating concept. We fully support accuracy in the rate structure and lower rates in total for our Illinois farm clients. We are concerned that given the comments heard on the long term "excessive profitability" of the Group 1 states that we are being asked to accept less underwriting gain in the SRA and, if the new rating structures cause average rates to decline further, to accept less future gains as well as lower A&O reimbursement. Several cuts no matter how small as a group can be fatal to the program.

(R. Tab XX, p. AIP00007310) (edits in original).

64.     On or about March 24, 2010, plaintiff Great American Insurance Company ("Great American") raised the issue of rate changes in corn and soybeans of 10 percent from price volatilities and questioned whether a 5 day snapshot to measure volatilities was enough, stating the rate changes between 2009 and 2010 were unprecedented and it was trying to figure out the cause, and RMA was asked what kind of rate change on average it was shooting for, to which RMA replied:

> We do a rate change every few years and we did a corn review a year or two ago, so there shouldn't be large changes in that. Now one thing could be going on is that large yields could be getting into their APH and increasing it over the reference yield and lowering rates that way. The amount of risk we thought was out there is lower than what we thought and that rates are going down in extremely good experience, so rates are going down.

(R. Tab TT, p. FCIC0045707; FCIC0082215-FCIC0082217, FCIC0082352).

65.     Plaintiff Great American asked for more transparency in the rating process so it can be more comfortable, and RMA stated that "Everything that has been done recently is, or will be soon, out on the website" (R. Tab TT, p. FCIC0045707; FCIC0082215, FCIC0082217, FCIC0082352).

66.     On or about April 7-8, 2010, the plaintiffs' Risk Sharing and A&O working group met and identified issues including:

> **- Rate adequacy**
>   - Historical
>   - Current
>   - Future rate realignments

(R. Tab XX, p. AIP00144084, AIP00238901; Tab YY, p. NCIS00002724-2774, NCIS00042989-NCIS00043056).

67.     On or about April 24, 2010, RMA released the Final Review, along with public comments received and responses to those comments, on its website at

http://www.rma.usda.gov/pubs/2009/comprehensivereview.pdf &

http://www.rma.usda.gov/pubs/2009/comprehensivereviewcomments.pdf (R. Tab O, 2480-2482).

68.     In the Final Review, Sumaria expressly stated:

> We do not draw any conclusion regarding recent underwriting gains. Several factors go into those calculations including the terms of the Standard Reinsurance Agreement (SRA) which are not addressed by this report. We suggested several changes to the RMA rating system some of which we believe will have significant impacts on underwriting gains/losses.

(R. Tab K1, 2150; Tab O, p. 2480-2482).

69.     The Final Review identified areas, such as type/practice factors, coverage level differentials, catastrophic loading, etc., where there is evidence that the rates may be biased and may be too high (R. Tab K, p. 2060, 2067).

70.     Sumaria suggested that weighting the historical data by policy count or acres tends to reduce the rates (R. Tab K, p. 2079).

71.     As of April 25, 2010, plaintiffs had reviewed a copy of the Final Review by Sumaria (R. Tab YY, p. NCIS00014230).

72.     On or about April 28, 2010, at least one plaintiff had reviewed the Final Review by Sumaria and summarized Sumaria's responses to various comments by the public commenters (R. Tab XX, p. AIP00232087-AIP00232088).

73.     On June 2, 2010, plaintiff American Agri-Business Insurance Company's managing general agent, ARMtech Insurance Services, Inc., commented on a Crop Insurance Professionals Association proposal to lower premium rates, stating:

> It is a very interesting concept but presented too late in the process I am afraid. It would have really put USDA on the spot and made them admit that they would not cut rates because they want the money. I would rather see the farmers get rate

cuts as opposed to the government keeping the money and the net effect on the companies would have been the same.

(R. Tab XX, AIP00114962).

74.     The Final Review had specific recommendations to improve the program, but it also contained suggestive analysis that led to a recommendation that RMA conduct further analysis (R. Tab F, p. 1401, 1460-1463, 1464-1466, 1467-1471, 1471-1473, 1473-1474, 1475; Tab 26, Ex. 10, Tom Worth Dep., p. 86; Ex. 9, Bill Murphy Dep., p. 73-74).

75.     On or about May 24, 2010, RMA posted a public solicitation, entitled "Methodology for Reweighting of Historical Experience," for an analysis to address the Review's recommendation regarding the re-weighting of historical experience and incorporation of weather variables into premium rates, and in that solicitation RMA stated:

> A Comprehensive Review of the RMA APH and COMBO Rating Methodology", available on RMA's public website at http://www.rma.usda.gov/pubs/index.html#actuarial, suggested that the statistical validity of its loss cost history could be improved by the incorporation of additional data. The study recommended that RMA consider altering the weight given to its historical loss costs. RMA has announced a solicitation for proposals for a methodology analysis review of the weighting of RMA's historical loss cost data. The solicitation is available at http://www.aqd.nbc.gov/Business/solicdetails.aspx?solid=311 and will remain open until June 24, 2010.

(R. Tab O, p. 2492).

76.     On or about June 10, 2010, RMA released the final draft of the 2011 SRA through Bulletin MGR-10-05 (R. Tab XX, p. AIP00230757-AIP00230759, AIP00228986-AIP00229033; AIP00230760-AIP00230917; Tab TT, p. FCIC0013316).

77.     RMA considered all the comments received on the second draft and made substantial changes to the final draft of the SRA in response those comments (R. Tab TT, p. FCIC11405-

16, FCIC13154-58; FCIC10734-37, FCIC33367-73; FCIC82268-73; Tab XX, p. AIP8179-82),

inter alia:

a.      RMA revised the gain and loss percentages in the new groups so that gains were

increased in the group 2 and 3 states at the 65-100 percent layer and losses were reduced at the

100-160 percent layer, which made the rate of return on retained premium an expected 14

percent (R. Tab TT, p. FCIC0013312; Tab V, p. 4252).

b.      RMA eliminated the reference prices and instead placed an overall cap on the

A&O subsidy payment not to exceed certain threshold (approximately $1.3 billion in 2011),

which would be around the amount AIPs made in 2010, with the maximum amount adjusted

annually for expected inflation (R. Tab TT, p. FCIC13309; Tab XX, p. AIP233019).  RMA also

created exceptions to the cap, including new crop/county programs; area plans, and the

additional A&O subsidy paid in states with 120 percent or greater loss ratios (R. Tab TT,

FCIC13309).

c.      RMA receives 6.5 percent of net underwriting gains or losses, after all other RMA

reinsurance, and RMA will distribute up to 1.5 percent without any other limit, of any Net Book

Quota Shares gain to plaintiffs that sell and service Group 3 States according to premium

generated in those States (R. Tab TT, p. FCIC0013312).

78.     On or about June 23, 2010, plaintiffs were reviewing the May 24, 2010 solicitation for

the reweighting of historical experience, including the statement of work, and a copy of the

solicitation was circulated within NCIS, which stated that the objective of the contract was "To

provide a thorough actuarial review of the ideas expressed with the Annual Production History

(APH)/Combo Methodology study of dealing with historical weighting of experience, and how

historical experience should be weighted under the Federal Crop Insurance Program." (R. Tab YY, p. NCIS000014636-NCIC000014687).

79.     In light of RMA's May 24, 2010 solicitation, Plaintiffs knew, prior to end of the renegotiation of the Standard Reinsurance Agreement on July 11, 2010, that RMA was evaluating as part of the Study the prediction of future weather events, reweighting of historical experience, and determining the appropriate number of years to establish the base rates (R. Tab NN, p. 5370; Tab XX, p. AIP00252333).

80.     On or about June 25, 2010, RMA sent a presentation to the "AAEA" conference to NCIS and in that presentation, RMA expressly stated that the based rating approach was "sound, but [had] room for improvement" and that RMA was evaluating alternatives for the reweighting of historical experience as well as additional rating variables to individualize rates and stay more current with rating factors (R. Tab XX, p. FCIC0056305-FCIC0056307).

81.     On June 30, 2010, RMA released the final 2011 SRA through Bulletin MGR-10-007 (R. AIP00035847-AIP00035848) and sent the 2011 SRA out for execution by plaintiffs (R. FCIC0030964-FCIC0030967; AIP00035133-AIP00035410, AIP00035447-AIP00035498; AIP00035847-AIP00035848; AIP00035849-AIP00035850).

82.     In the final 2011 SRA, RMA revised the provisions in the previous draft SRA so as to provide  $1.22 billion in A&O proposed by the plaintiffs, and adjusted the A&O provisions to reflect this amount; reinterpreted the provisions of the Act to set a floor on the amount of A&O that can be paid under the SRA if there is a significant price drop; and removed the A&O provisions that reduce the rate paid based on the coverage level selected, and instead would pay the maximum A&O rate contained in the applicable provision for all coverage levels. Thus, in exchange for the possibility of lost dollars in the future if prices significantly increase, the

plaintiffs would get the immediate benefit of a higher reimbursement rate for certain policies at

the higher coverage levels, and a significant increase in A&O from that proposed in the second

draft, as well as the future benefit of a floor on A&O if the prices were to significantly decrease.

(R. Tab YY, p. NCIS571-573).

83.    By July 11, 2010, all plaintiffs had signed the SRA (R. Tab TT, p. FCIC0030925; Tab

XX, p. AIP00231190, AIP00036673).

84.    On or about July 22, 2010, NCIS testified before Congress, stating:

> Second, while the industry would hope to be able to move forward with no further
> financial shocks, we emphasize that, unlike private property casualty companies,
> crop insurance companies do not set premium rates and cannot compete using rate
> changes. Nor are the companies able to adjust rates to recoup losses in previous
> years. Premium rate changes can have major impacts on industry profitability, and
> the companies are handicapped by not knowing what will happen with respect to
> premium rates. Historically, the companies have not been part of the rate setting
> process.

(R. Tab XX, p. AIP00008841-AIP00008850).

85.    RMA also testified at that hearing and gave a comprehensive review of the status of the

Review, stating:

> RMA contracted with Sumaria Systems Inc. for a thorough actuarial review of the
> methodology and procedures used to determine the Actual Production History
> (yield) target rates and the rating process for the new Common Crop Insurance
> Policy Basic Provisions (often referred to as Combo policy) under the Federal
> crop insurance program. The draft report was received in November 2009 and
> was made available for public comment. A final version of the review is now
> available at http://www.rma.usda.gov/pubs/2009/comprehensivereview.pdf on the
> RMA Web site. The review found that RMA's general premium rating
> methodology (based on historical losses) is appropriate and should continue to be
> used. However, the study identified several areas for potential improvement, the
> most significant of which is to determine if all historical losses should be given
> the same weight in determining premium rates. In addition, key aspects of today's
> crop insurance program along with crop production technology would also be
> considered and evaluated for potential effects on past experience. This would
> provide a basis for evaluating the degree to which past catastrophic events may
> affect the historical loss data used in establishing current premium rates, and as
> appropriate, allow for adjustments to those rates. This could potentially result in

lower premium rates in several parts of the country, especially the Corn Belt. RMA is currently in the process of soliciting bids for this review of its historical loss data so that work can commence later this year. In the near term, premium rates for the most popular revenue products, Crop Revenue Coverage (CRC) and Revenue Assurance (RA), are expected to be generally lower for the 2010 crop year as a result of decreasing price volatilities.

(R. Tab XX, p. AIP00008861-AIP00008884).

86.    On or about August 27, 2010, a contract was awarded to Sumaria Systems, Inc., to undertake the Methodology for Reweighting of Historical Experience Study (referred to as the "Sumaria Study") (R. 2315-2337, 5387-5411).

87.    On or about June 11, 2011, Sumaria provided a draft report entitled "Methodology Analysis for Weighting of Historical Experience, Implementation Report" (R. Tab P, p. 2818-2900).

88.    On or about July 12, 2011, Sumaria provided its final report for the Methodology Analysis for Weighting of Historical Experience – Revised Technical Report (Sumaria Study) (R. Tab R, R1, p. 2951-3415).

89.    On August 23, 2011, RMA and Sumaria met with the plaintiffs to discuss the Sumaria Study (R. Tab S, p. 3660, 3664, 3872; Tab XX, p. AIP00233017).

90.    The impact of all the changes recommended in the Sumaria Study was an approximate decrease of 14 percent for corn and 20 percent for soybeans nationwide (R. Tab S, p. 3937-3941).

91.    In response to the plaintiffs' concerns, on or about August 25, 2011, RMA began an analysis that would restate historical loss ratios using the proposed 2012 rates for corn and soybeans and would restate the indemnities paid so that the impacts could be clearly revealed (R. Tab S, p. 3679, 3747; Tab V, p. 4184-4185; Tab 26, Ex. 9, Bill Murphy Dep., p. 116-117, 119; Tab 26, Ex. 10, Tom Worth Dep., p. 149-150).

92.     To test the new rates to ensure that the loss ratio would still be below 1.0, RMA and

Sumaria adjusted the actual loss ratios to reflect the current premium rates and concluded that for

the periods from 1975 to 2010, for all crops the loss ratio declined from 1.18 to .94 and, if corn

and soybeans are removed, the loss ratio declines from 1.33 to .96 (R. Tab S, p. 3942; Tab 26,

Ex. 10, Tom Worth Dep., p. 150-151).

93.     Plaintiffs had questions and suggested independent confirmation that the proposed rate

changes are appropriate and stated:

> Transparency on the rating methodology change is both necessary and urgent. It is
> essential that all studies on this issue be provided to NCIS and AIPs immediately.
> Subsequent posting on the RMA website may well be too late for AIPs to make
> meaningful comments. Once we have these materials, we shall be sending a letter
> with specific questions and critiques.

(R. Tab S, p. 3679; Tab YY, p. NCIS00030406; NCIS00030414).

94.     Before proceeding on any of the recommendations, RMA considered contracting for a

peer review by the plaintiffs and other experts of the Sumaria Study, but RMA did not release the

Sumaria Study because it had not yet been finalized (R. Tab S, p. 3750-3752, 3828-3831; Tab

PP, p. 5517; Tab XX, p. AIP00236952, AIP00249331, AIP00242595).

95.     NCIS was chosen as a peer reviewer of the Sumaria Study on behalf of the plaintiffs (R.

Tab V, p. 4186, 4193-4200, 4208, 4211-4213, 4215-4231; Tab PP, p. 5546-5547; Tab QQ, p.

5551-5553; Tab XX, p. AIP242595).

96.     RMA stated that it did not believe the rate of return under the SRA would be affected by

the recommended changes in the rating methodology but the volume of dollars could change (R.

Tab S, p. 3751-3752).

97.     RMA estimated that although it negotiated the financial terms of the SRA with a goal of reaching a target of a 14 percent rate of return in the 2011 SRA, the actual rate of return exceeded that amount in 2011 (R. Tab V, p. 4252).

98.     RMA also estimated that if it had not revised premium rates, the rate of return under the 2011 and future SRAs would have increased from 14.4 percent to 17.2 percent (R. Tab TT, p. FCOC006005-FCIC006006; Tab XX, p. AIP00249328-AIP00249330).

99.     The plaintiffs anticipated a 17 percent underwriting gain without the premium rates revision (R. Tab XX, p. AIP00249333; AIP00244879).

100.    As of August 30, 2011, RMA was still working through the recommendations; some it had agreed with, but others it still was considering (Tab 26, Ex. 5, Kent Lanclos Dep., p. 93-94).

101.    RMA had not finalized the premium rates as of late August to early September (Tab 26, Ex. 4, Joe Glauber Dep., p. 98, 101-104).

102.    Implementation of the Sumaria Weighting of Historical Experience Study recommendations was not a foregone conclusion in October 2011 and RMA was waiting on the results from the independent reviewers (Tab 26, Ex. 9, Bill Murphy Dep., p. 134-135).

103.    Some of the plaintiffs were seeking a phase in of the rate changes proposed by the Sumaria Weighting of Historical Experience Study (Tab 26, Ex. 9, Bill Murphy Dep., p. 102).

104.    RMA agreed to a phased in approach (R. Tab X, p. 4692-4693, 4724; Tab Y, p. 4816; Tab AA, p. 4932, 4937; Tab 26, Ex. 9, Bill Murphy Dep., p. 139; Tab 26, Ex. 10, Tom Worth Dep., p.188).

105.    As of November 8, 2011, RMA was still considering how to conduct the phase in of the rate adjustments (R. Tab X, p. 4668).

106.    On or about November 9, 2011, RMA reached its decision on the implementation of rate adjustments (R. Tab AA, p. 4915-4918).

107.    The phased in approach included "a discount equal to about one-third of the full implementation, plus additional updates relative to prevented planting, replant, and quality adjustment. Any change in rates was then capped at 15 percent." (R. Tab AA, p. 4889).

108.    This decision was complicated by the actions of the FCIC Board to allow the Biotechnology Endorsement to expire, and the corresponding discount was to be integrated into the base rate for corn effective for the 2012 crop year (R. Tab S, p. 3565, 3580-3581; Tab 26, Ex. 8; http://www.rma.usda.gov/tools/behybrids.html).

109.    The Biotechnology Endorsement integration would have added another 8-10 percent reduction in premium for corn. (R. Tab AA, p. 4888, 4914, 4928; Tab 26, Ex. 10, Tom Worth Dep., p.189).

110.    In some of the states, including the Biotechnology Endorsement discount into the base rates alone would have produced a higher premium rate reduction than the phased in premium reduction actually implemented by RMA for corn in 2012 (R. Tab AA, p. 4888, 4914, 4928).

111.    After the phase in, RMA estimated the initial reductions in premium nationally would average 7 percent for corn and 9 percent for soybeans, assuming that producers did not increase their coverage levels, but this rate reduction is only on the yield portion of the rate, which makes up less than half of the total premium rate in the Corn Belt, with the rest coming from the price risk (R. Tab X, p. 4691; Tab XX, p. AIP00245183).

112.    This means the effective decrease for states like Illinois--with an average 12 percent reduction--is actually a 5-6 percent reduction (R. Tab XX, p. AIP00245183, AIP00245347).

113.    On or about November 30, 2011, RMA released revised premium rates for the 2012 crop

year for corn and soybeans (R. 5066-5067, 5655).

**Sumaria Review (2009-10) and Sumaria Study (2011)**

114.    The 2009-10 Review by Sumaria had concluded that RMA should continue to use the

basic loss cost methodology approach to rating (R. Tab F, p. 1401).

115.    Specifically, Sumaria at that time had stated:

> We recommend that RMA continue to use loss experience as the foundation of
> the rating system as it is the only way to assure that actual losses drive the rating
> results. This is consistent with standard property and casualty insurance rating
> practices. While crop insurance poses a unique set of actuarial challenges,
> alternatives to loss-experience-based rating would likely fail to adequately
> address the multiple objectives imposed on the APH program.

(R. Tab F, p. 1402).

116.    While the Sumaria Review recommended using the loss cost methodology, it expressly

contained specific recommendations, including to improve the rating methodology. (R. Tab F, pp.

1402-1403, 1460-1513).

117.    On or about June 11, 2011, Sumaria provided the draft Sumaria Study, which contained

several recommendations, most of which were the same as or which followed on those in

Sumaria's 2009-10 Review:

> Recommendation 1.- We recommend that RMA use Climate Division Data for
> calculating crop-specific weather indexes.  We believe the weather data collection
> that best meets the weather-data criteria outlined in Section 4 of this report is the
> National Climatic Data Center's Time Bias Corrected Divisional Temperature-
> Precipitation-Drought  Index data, also called the climate division data.  The
> climate division data provide several drought indexes and other weather variables
> that are time-aggregated to the monthly level and spatially-aggregated to the
> climate division level for the years back to 1895.  Thus, the data allow RMA to
> compare the weather experience incurred by the modern program to weather
> extending 80 years prior to the 1975 cut-off of available loss-cost data.

> Recommendation 2. - We recommend that RMA use fractional logit models
> estimated at the climate division level to relate loss cost experience to the Palmer

Drought Severity Index (PDSI) and Cooling Degree Days (CDD).  Time period variants of both weather indicators should be used for different crops and locations. An out-of-sample forecasting competition is suggested to select the time-period/variables for a crop/climate division, and if the models are not found statistically significant we recommend no weather weighting.  This process creates a weather index from 1895-present which characterizes the growing conditions experienced in each year.

Recommendation 3.- Given recommendation 2 we propose that RMA categorize the loss cost experience observed over the period chosen into weather 'probability bins' or categories.  These bins would be chosen according to an incremental procedure which would select a parsimonious number of bins for the crop/climate division.  Once observed loss costs are categorized within bins, all historical loss costs within a bin are given equal weather probability.  The bins recommended would have variable width but equal probability.  The variable width binning process we propose ensures that at least one year during the rating period is classified in each bin, thereby providing proper weights that reflect all of the historical weather data.

Recommendation 4. - While not a directive in the statement of work, a conclusion reached during our analysis is that RMA should use all years available to calculate the catastrophic load and that extreme loss costs within the catastrophic load should be weighted using the weather index probabilities.  Further, we recommend changing the catastrophic load cap to the 90th percentile and reducing the aggregation region for catastrophic load from the state level to a climate division, which is consistent with the weather weighting procedure.  We also recommend dampening of the weight given to the most extreme weather years. Specifically, if the weather index for a particular year is above the 97th percentile, we recommend that the weight given to that year's input to the catastrophe load be adjusted to reflect the percentile of the weather index. That is, if the data span 30 years of experience, a year with a weather index at the 98th percentile should be given 2% (1-in-50) weight rather than 3.33% (1-in-30) weight.  The weight taken from the adjusted year should then be spread evenly among the remaining years.

Recommendation 5. - A variety of factors suggests non-stationarity in some RMA loss cost data. Such factors include an expanding participant pool, evolving production systems, the advent of biotechnology, and changing program underwriting rules. In many cases it is difficult, if not impossible, to disentangle these effects.  We recommend that RMA use adjustments to remove non-stationarity from the loss cost history when statistical analysis supports the adjustment.  We recommend estimating these adjustments at the national level for a crop and that weather should be taken into account when these models are estimated.  Further, symmetric caps on the magnitude of the adjustments should be imposed to avoid excessive modification of the loss history in any particular location.

We first recommend that a discrete adjustment for data prior to 1995 be applied to the adjusted loss cost data.  Specifically, we recommend estimating the effect at the national level and calculating a percentage difference by state using the effect relative to the post-1995 average loss cost.  However, we stress that where analysis indicates that non-stationarity in the loss cost history is not statistically significant, no adjustment should be made

Second, we recommend shortening the loss history for base rates to 20 years while using a longer series of years for catastrophic loading. This recommendation reflects the recognition that longer time series are needed to capture extreme events than for measuring the risk quantified by the base rate. Finally, we recommend using net acreage weighting within probability categories or 'bins', which recognizes the additional credibility of experience that is based on more exposed acres.

(R. Tab P, p. 2818-2900; see also Tab K, p. 1995-1997, 2053, 2055-2056, 2057, 2060, 2064, 2066, 2067, 2068, 2069, 2070, 2084, 2086, 2099, 2013-2106).

118.    A comparison of the 2009-10 Sumaria Review with the 2011 Sumaria Study shows that the 2011 Study simply was reviewing Sumaria's own prior recommendations in order to determine how to make rates more accurate and effective (R. Tab TT, p. FCIC0083815, FCIC0083861; FCIC0083933- FCIC0083952).  For instance:

a. With respect to catastrophic loading - The Sumaria Review recommended RMA re-evaluate the catastrophic loading procedure and reduce the degree to which catastrophic loading influences rates in low risk regions (R. Tab F, p. 1475). The 2011 Sumaria Study in turn recommended that catastrophic load be adjusted using weather weighting and dampening the effect of extreme weather years (R. Tab P, p. 2837-2838).  On December 17, 2009, RMA already had discussed with plaintiffs the fact that the 20 percent rule may be reallocating too large a portion of the county losses and that it needed to determine whether different CAT loads by type and practice are appropriate and to consider whether the current minimum CAT load is appropriate (R. Tab NN, p. 5369).

b. With respect to the 20 year loss period for base rates - The Sumaria Review discussed all the program changes that have occurred over time, such as participation patterns, program characteristics, agronomic changes, traited seed, precision farming, etc., that reveal that giving each year equal weight may not be appropriate and older data may have to be adjusted, and the Review accordingly suggested possible approaches, including estimating losses solely on a shorter time series, such as looking at the period since 1997 (R. Tab F, p. 1479-1482). The Sumaria Study in turn discussed how adjustments could be made to the loss cost data because of all the program changes and made several recommendations for adjustments, including basing rates on 20 years of experience (R. Tab P, p. 2834-2836).

c. With respect to the weather weighting and weighting by net acres - The Sumaria Review suggested weather weighting based on a Palmer Drought Index or indices with multiple weather variable, using a time series back to 1895 (R. Tab F, p. 1479, 1484-1487). The Sumaria Study in turn recommended weather weighting based on Climate Division Data back to 1895, with some adjustments for the Palmer Drought Severity Index (PDSI) and Cooling Degree Days (CDD) (R. Tab P, p. 2840-2842).  Further, the 2009-10 Sumaria Review had suggested weighting by net acres to concentrate the experience into the more recent years (R. Tab F, p. 1482-1484). The 2011 Sumaria Study recommended weighting the data within bins by net acres to account for credibility and recency (R. Tab P, p. 2834).

d. With respect to the pre-1995 loss history adjustment - The Sumaria Review stated that because of changes in participation, the program, and technology, it may not be appropriate to weigh each loss year equally, and the 2009-10 Review accordingly recommended adjusting the historical data to give more weight to recent data (R. Tab F, p. 1482). The 2011 Sumaria Study recommended an adjustment due to the different nature of the program before and after 1995,

with an almost doubling of participation during that timeframe, and thus the pre-1995 data is not likely representative and should be given less weight (R. Tab P, p. 2836-2837).

119.    The Sumaria Review (R. Tab P, p. 2818-2900; Tab YY, p. NCIS000014679) found that for "[f]or the major commodity crops (e.g., corn, soybeans, spring wheat, and cotton), accounting for recency using all the weighting approaches above generally reduces the average loss costs compared to when recency is not accounted for." (R. Tab P, p. 2864).  That is, the weighted loss costs tended to be lower than the unweighted loss costs. (R. Tab P, p. 849).

120.    These findings show that RMA's prior rating system of giving each year's losses equal weight overstated historical indemnities and, when the overstatement is corrected, premiums must be reduced to be sufficient to cover the new, lower expected losses. (R. Tab YY, p; NCIS000014679; Tab 26, Ex. 10, Tom Worth Dep., p. 152-153; 166-167, 181-183; Tab 26, Ex. 4, Joe Glauber Dep., p. 157-158).

    a.    To accomplish this adjustment, past historical experience needs to be recast based on the recommendations in Sumaria Weighting of Historical Experience Study. (Tab 26, Ex. 10, Tom Worth Dep., p. 152-153; Tab 26, Ex. 4, Joe Glauber Dep., p. 157-158, 165, 169, 181-183).

    b.    For example, if the historical indemnities were $100, premium would have been set at $100, plus a reasonable reserve. (Tab 26, Ex. 10, Tom Worth Dep., p. 152-153).

    c.    Under the Sumaria Study analysis, after reweighting the historical data to reflect the actual expected risk, the expected indemnities is only $80, so premium is reduced to $80 plus a reasonable reserve to cover that risk. (Tab 26, Ex. 10, Tom Worth Dep., p. 152-153).

    d.    This means the loss ratio remains at 1.0, which is what it was before any reduction of premium (Tab 26, Ex. 10, Tom Worth Dep., p. 153).

121.    The results in 2012 validated the assumption that risks have been reduced in more recent

years, for 2012 was considered one of the worst droughts since the dust bowl, but the loss ratio

was not nearly as bad as it was in 1988, when there was a less severe drought. (Tab 26, Ex. 10,

Tom Worth Dep., p. 152).

    a.    This affirms that the biotech corn and agronomic changes have fundamentally

changed the program from what it used to be. (Tab 26, Ex. 10, Tom Worth Dep., p. 152). From

1980 to 1993 there was no year where the loss ratio was less than 1.0. (Tab 26, Ex. 10, Tom

Worth Dep., p. 152).

    b.    After 1994, there were few loss ratios greater than 1.0. (Tab 26, Ex. 10, Tom

Worth Dep., p. 152; Tab 26, Ex. 12, Tim Witt Dep., p. 25-26).

    c.    The Sumaria Study showed those losses from before around 1995 are not

representative, and rates need to be restated to reflect the existing present risk and failure to do so

would result in extra premium that was never intended. (R. Tab TT, p. FCIC6005; Tab 26, Ex.

10, Tom Worth Dep., p. 153).

    c.    Therefore, premium must be reduced commensurately. (Tab 26, Ex. 10, Tom

Worth Dep., p. 152-153).

### 2011 and Subsequent SRA Terms

122.    There were numerous meetings with plaintiffs individually and collectively, and

comments to the draft SRAs were provided by plaintiffs, but plaintiffs neither in their comments

to the drafts of the 2011 SRA, nor in their edits to the drafts of the 2011 SRA, nor in any of the

individual or group meetings with RMA held after the first draft of the SRA was released on

December 4, 2009, ever included any language to adjust the financial terms of the 2011 SRA to

take into consideration any possible future rate changes (R. Tab XX, p. Tab TT, p.

FCIC0044823; FCIC008195 FCIC0012607-FCIC0012610, FCIC0012683-FCIC0012685,

FCIC0015277-FCIC0015283, FCIC0082155, FCIC0083764 -FCIC0083772, FCIC0044831-

FCIC0044832, FCIC0044857-FCIC0044866; FCIC0082187-FCIC0082218, FCIC0044815;

FCIC0082183-FCIC0082185, FCIC0044793; FCIC0059395, FCIC0016302-FCIC0016309,

FCIC0016317-FCIC0016320, FCIC0044819, FCIC0082343, FCIC0082339, FCIC0045661,

FCIC0044819, FCIC0044825; FCIC0082374, FCIC0044841, FCIC0038433; FCIC0082351,

FCIC0044821, FCIC0082351, FCIC0007372-FCIC0007390, FCIC0057634, FCIC0045105-

FCIC0045123, FCIC0082354- FCIC0082355, FCIC0045467-FCIC0045468, FCIC0045451,

FCIC0045613-FCIC0045614, FCIC0006141-FCIC0006142, FCIC0006174-FCIC0006175;

FCIC0082189-FCIC0082190, FCIC0033870, FCIC0033870; FCIC0066189, FCIC0010994,

FCIC0035570-CIC0035572; FCIC0082362-FCIC0082364, FCIC0009887, FCIC0009370-

FCIC0009375, FCIC0009385- FCIC0009387; FCIC0054626, FCIC0054803-FCIC0054806,

FCIC0054808-FCIC0054809, FCIC0055143-FCIC0055145, FCIC0056027-FCIC0056028,

FCIC0008652-FCIC0008653, FCIC0009394-FCIC0009399, FCIC0059335, FCIC0008692,

FCIC0008699-FCIC0008700, FCIC0008705-FCIC0008706, FCIC0008886, FCIC0008907-

FCIC0008908, FCIC0008910-FCIC0008911, FCIC0008913- FCIC0008916, FCIC0008938,

FCIC0008983-FCIC0008984, FCIC0008924- FCIC0008925, FCIC0008924- FCIC0008925,

FCIC0045413, FCIC0057919-FCIC0057998, FCIC0082221-FCIC0082228, FCIC0029094,

FCIC0054611-FCIC0054612, FCIC0010771-FCIC0010773, FCIC0043833, FCIC0045680-

FCIC0045684, FCIC0045447; FCIC0082217-FCIC0082219, FCIC0082262, FCIC0082352,

FCIC0082215-FCIC0082217, FCIC0045711; FCIC0082262, FCIC0045707; FCIC0082215-

FCIC0082219, FCIC0082352, FCIC0045707; FCIC0045685-FCIC0045687, FCIC0045447;

FCIC0082207-FCIC0082209, FCIC0082211-FCIC0082212, FCIC0082213-FCIC0082214,

FCIC0082371, FCIC0082373, FCIC0045699; FCIC0082207, FCIC0045447, FCIC0045703;

FCIC0082332-FCIC0082334, FCIC0045447, FCIC0045663; FCIC0082238-FCIC0082239,

FCIC0082336-FCIC0082337, FCIC0082338, FCIC0082339-FCIC0082340, FCIC0082353,

FCIC0045663; FCIC0045699; FCIC0082335-FCIC0082337, FCIC0045447;

FCIC0045669FCIC0082345, FCIC0082347, FCIC0082348-FCIC0082350, FCIC0082375,

FCIC0082376-FCIC0082377, FCIC0045645, FCIC0045673, FCIC0045679; FCIC0082345,

FCIC0082347- FCIC0082350, FCIC0045065- FCIC0045066, FCIC0045659; FCIC0082356-

FCIC0082357, FCIC0082361, FCIC0045447, FCIC004566,; FCIC0082341-FCIC0082342,

FCIC0082344, FCIC0045447, FCIC0045637; FCIC0082378-FCIC0082380, AIP00229813-

AIP00229829, FCIC0044975-FCIC0044976, FCIC0045633; FCIC0082372, FCIC0045097-

FCIC0045104, FCIC0044985-FCIC0044986, FCIC0011025-FCIC0011026, FCIC0045420;

FCIC0045415, FCIC0045423, FCIC0045749, FCIC0067924, FCIC0033361; FCIC0041933;

FCIC004202; Tab XX, p. AIP00006710-AIP00006711, AIP00006706, AIP00006763-

AIP00006765, AIP00006767-6768, AIP00046086-AIP00046087, AIP00216860-AIP00216896 ,

AIP00030827; AIP00018733-AIP00018754, AIP00144572-AIP00144576, AIP00144577,

AIP00238393-AIP00238409, AIP00223128,  AIP000006822-AIP00006829, AIP00223145,

AIP00020377, AIP00020378-AIP00010379, AIP00144193, AIP00155033-AIP00155037,

AIP00144599-AIP144609, AIP00245764-AIP00245766, AIP00236729-AIP00236752,

AIP00047704-AIP00047710, AIP00238571-AIP2387573, AIP00238774-AIP00238832.

AIP00238579-AIP00238793, AIP00238833, AIP00243959-AIP00243964, AIP00139327-

AIP00139378, AIP00240447-AIP00240488, AIP00143581-AIP00143833, AIP00249424,

AIP00049035, , AIP00240643-AIP00240645, AIP00240647-AIP00240648, AIP00210964,

AIP00229894-AIP00229897, AIP00245997-AIP00245998,  AIP00007308-AIP00007311,

AIP00007309-AIP00007311, AIP00144579-AIP00144588, AIP00246075-AIP00246084,

AIP00246076-AIP246082, AIP00237307, AIP00025971-25974, AIP00048749- AIP00048762,

AIP00007357-AIP00007364, AIP00246002, AIP246004, AIP00071028-AIP00071032,

AIP00220481-AIP00220486, AIP00229661- AIP00229663, AIP00144084, AIP0009343-

AIP0009345, AIP00240826-AIP00240828, AIP00230608, AIP00229813- AIP00229829,

AIP00243763-AIP00243771, AIP00144589-AIP00144598, AIP00229922, AIP00229923-

AIP00230154, AIP00237424-AIP00237444, AIP00071116-AIP00071124; AIP00048744,

AIP00142888-AIP00142889, AIP00007407-AIP00007410, AIP00029642, AIP00114062,

AIP00048744,  AIP00245084; Tab YY, p. NCIS00025454-NCIS00025463; NCIS00025467;

NCIS00025468, NCIS00025472, NCIS00035464-NCIS00035471, NCIS00000510,

NCIS00000516- NCIS00000518, NCIS00001971-NCIC00001973, NCIS00035504,

NCIS00048683, NCIS00042989-NCIS00043056, NCIS00026450-NCIS00026493,

NCIS00000439- NCIS00000480, NCIS00000488- NCIS00000509, NCIS00029856-00029861,

NCIS00000666-NCIS00000671; NCIS00029857-NCIS00029859, NCIS00029860;

NCIS00029918-00029920, NCIS00029921-00029923; NCIS00033139, NCIS00049016-

NCIS00049020, NCIS00049023-NCIS00049026, NCIS00049035-NCIS00049046;

NCIS00025140-NCIS00025143).

123.    The 2011 SRA signed by the plaintiffs does not include premium as a term of the SRA

(Tab B, p. 87-135).

124.    The SRA is a one year agreement. (R. 87). The definition of "Agreement" states:

> "Agreement" means this Standard Reinsurance Agreement, including Appendices,
> the Act, and regulations, in effect as of the July 1 start of the reinsurance year,
> unless otherwise provided for in the Agreement. An Agreement in effect for a
> reinsurance year constitutes a separate and distinct Agreement from any
> Agreement that may be in effect for any other reinsurance year, even if the
> Agreement has been renewed in accordance with section IV(l). Unless

specifically provided for in this Agreement, if there is a conflict between a provision of the Act, the regulations, or FCIC procedures with the terms of this Agreement, the order of precedence will be: (1) the provisions of the Act; (2) the regulations; (3) this Agreement; and (4) FCIC procedures, with (1) controlling (2) and (2) controlling (3), etc. The Act and regulations are available on the RMA website (www.rma.usda.gov).

(R. Tab B, p. 90).

125.    The definition of "Act" in the SRA states: "'Act' in lieu of the definition in the incorporated regulations, means the Federal Crop Insurance Act (7 U.S.C. §§ 1501-1524)." (R. Tab B, p. 89).

126.    In section I of the SRA, "reinsurance year" is defined as "the term of this Agreement beginning July 1 and ending on June 30 of the following year and, for reference purposes, identified by reference to the year containing June." (R. Tab B, p. 97).

127.    Section IV(l)(1) of the SRA states:

This is a single year Agreement that ends June 30 of the reinsurance year. The Company can enter into a new Agreement under the terms and conditions that exist as of March 15 preceding the reinsurance year, except as otherwise provided in this Agreement, by filing a Plan of Operations and obtaining approval from FCIC.

(R. Tab B, p. 131).

128.    Under section I of the SRA, "eligible crop insurance contract" is defined as "an insurance contract for an agricultural commodity authorized by the Act and approved by FCIC, with terms and conditions in effect as of the applicable contract change date, that is sold and serviced consistent with the Act, FCIC regulations, the procedures and this Agreement, having a sales closing date within the reinsurance year, and with an eligible producer" (R. Tab B, p. 92).

**Regulatory Provisions**

129.    Under section 1 of the Common Crop Insurance Policy Basic Provisions (Basic Provisions) (7 C.F.R. § 457.8), "policy" is defined as:

The agreement between you and us to insure an agricultural commodity and consisting of the accepted application, these Basic Provisions, the Crop Provisions, the Special Provisions, other applicable endorsements or options, the actuarial documents for the insured agricultural commodity, the Catastrophic Risk Protection Endorsement, if applicable, and the applicable regulations published in 7 CFR chapter IV.

(Tab 26, Ex. 7).

130.    Section 1 of the Basic Provisions also defines "actuarial documents" to include premium

rates. (Tab 26, Ex. 7).

131.    Under section 4(b) of the Basic Provisions, premium rates can be changed until the

contract change date (Tab 26, Ex. 7).

Respectfully submitted,

VINCENT H. COHEN, JR., D.C. Bar #471489
Acting United States Attorney

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

By:   /s/_____
PETER C. PFAFFENROTH, D.C. Bar # 496637
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 252-2513
Email: peter.pfaffenroth@usdoj.gov

*Attorneys for Defendants*

Of counsel:
KIMBERLEY E. ARRIGO, D.C. Bar # 983330
Office of the General Counsel
United States Department of Agriculture
1400 Independence Ave, S.W.
Washington, D.C. 20250
Phone: (202) 690-2391
Email: kim.arrigo@ogc.usda.gov